IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CHUCKY L. NANCE and          )
JENNIFER R. NANCE,           )
                             )
            Plaintiffs,      )
                             )
    v.                       )          1:19CV641
                             )
CITY OF ALBEMARLE, NORTH     )
CAROLINA, MAYOR RONNIE       )
MICHAEL, individually and in )
his official capacity, CHIEF )
DANNY BOWEN, individually and)
in his official capacity, SA )
MEREDITH SHOAF, individually,)
and KEVIN ROBINSON, DIRECTOR OF )
PLANNING AND DEVELOPMENT      )
SERVICES, individually and in )
his official capacity,        )
                             )
            Defendants.       )

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Before this court is a Motion to Dismiss pursuant to Rule
12(b)(6) filed by Defendants City of Albemarle, Mayor Ronnie
Michael, Chief Danny Bowen, and Kevin Robinson. (Doc. 10.)
Defendant Meredith Shoaf filed a separate motion to dismiss.
(Doc. 14.) For the reasons stated herein, this court finds it
should grant both motions as to all federal claims. This court

declines to exercise supplemental jurisdiction over the remaining state claims.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On a motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint . . . ." Ray v. Roane, 948 F.3d 222, 226 (4th Cir. 2020) (quoting King v. Rubenstein, 825 F.3d 206, 212 (4th Cir. 2016)). The court may also consider documents "attached to the complaint as exhibits . . . ." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016); see also Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). The following facts are taken from the Complaint and its attachments as true.

### A.    Factual Background

Plaintiffs are husband and wife. (Complaint ("Compl.") (Doc. 1) ¶ 14.) Plaintiffs own the property at the center of this dispute, a property in the town of Albemarle, North Carolina, known as the "Heart of Albemarle" (the "Property"). (Id.) Defendant the City of Albemarle ("City") is a municipality in North Carolina. (Id. ¶ 8.) Defendant Ronnie Michael was the mayor of Albemarle during all times relevant to this suit. (Id. ¶ 4.) Defendant Robert Daniel Bowen was the Albemarle City Chief of Police during all relevant times. (Id. ¶ 5.) Defendant

-2-

Meredith Shoaf was a Special Agent in the North Carolina State Bureau of Investigation working in the Alcohol Law Enforcement branch. (Id. ¶ 6.) Defendant Kevin Robinson was the Director of Planning and Zoning for the City of Albemarle. (Id. ¶ 7.) This court has jurisdiction pursuant to 28 U.S.C. § 1331.

After Plaintiffs bought the Property, they leased it to Charlene Smith, who in turn leased it to individual tenants on "an extended stay basis." (Id. ¶ 15.) Plaintiffs were interested in having the Property approved for use as "Section 8"[1] housing, and they asked Eric Allsbrook, a Section 8 Inspector with the City of Albemarle to tour the Property and "see if after renovations the property would meet minimum HUD requirements." (Id. ¶ 16.) The inspector said the Property would qualify after renovations were made and provided a letter stating this. (Id.) Around February 2017, Plaintiff Chucky L. Nance ("Mr. Nance") made all Defendants, except Defendant Shoaf, aware of his plans for the Property. (Id. ¶ 18.) Plaintiffs allege that, at the same time, the City was considering purchasing a building across the street from the Property. (Id. ¶ 24.)

---

[1] "Under the Section 8 program, the federal government provides funds to local housing authorities, which then subsidize rental payments for qualifying low-income tenants in privately-owned buildings." Mhany Mgmt., Inc. v. Cnty. of Nassau, 819 F.3d 581, 588 (2d Cir. 2016) (citing 42 U.S.C. § 1437f(o)(1)(A)).

-3-

In anticipation of conducting the renovations on the Property, Mr. Nance began applying for the necessary permits on March 3, 2017, (id. ¶ 20), and "Central Permitting of Stanly County" subsequently issued those permits to Mr. Nance, who paid for them, (id. ¶ 21). However, the City of Albemarle's Planning and Development Services Department requires individuals whose building projects are located within the City of Albemarle to submit a City Coordination Form, to review the project for compliance with applicable City ordinances and Fire Code. Permitting & Inspections. City of Albemarle Planning and Development Services Department, Permitting & Inspections, https://www.albemarlenc.gov/departments/planning-and-development-services/building-inspections (last visited Feb. 3, 2021).

On or about March 24, 2017, Plaintiffs received a letter from Defendant Bowen stating that the Property was being used in an illegal manner under "Chapter 19, Article 1, of the North Carolina General Statutes." (Compl. (Doc. 1) ¶ 22.) The letter stated that:

> [d]uring the past several months, the Albemarle Police Department has responded to numerous calls at this Property. Reported unlawful activities on the property include illegal possession and sale of controlled substances and repeated acts which create and constitute a breach of the peace, including fights and assaults. Citizens in the community have repeatedly

-4-

complained to law enforcement authorities about such activities occurring upon your property.

(Compl. (Doc. 1), Ex. A, Chief Bowen Nuisance Letter ("Bowen Letter") (Doc. 1-1).) The letter also stated that Mr. Nance had forty-five days to abate the nuisance. (Id.)

Mr. Nance responded with his own letter on March 31, 2017, stating that he would "promptly evict all current residents . . . and begin the renovations to the property that were discussed at a previous council meeting . . . ." (Compl. (Doc. 1) ¶ 25.) Mr. Nance also requested a "copy of the investigation, all complaints, a copy of the documents your attorney referenced in our meeting on March 30, 2017 so that I may best alleviate any concerns." (Id. ¶ 26.) Mr. Nance also asked for confirmation within five days that Defendants "would consider this matter settled upon the evictions and the beginning of renovations and would cease any enforcement efforts based on the circumstances alleged . . . ." (Compl. (Doc. 1), Ex. B, Letter from Mr. Nance to Defendants ("Nance Letter") (Doc. 1-2) at 1.) Plaintiffs allege that Defendants "failed and/or refused to respond to his request." (Compl. (Doc. 1) ¶ 27.)

On April 5, 2017, Mr. Nance "attempted to apply for a required City of Albemarle Coordination Form with the City of

Albemarle for renovations to Building 3."[2] (Id. ¶ 30.) Defendant Robinson, upon learning that Mr. Nance was applying for the form, sent an email to the City's attorney asking how to proceed. (Id. ¶ 31.) The attorney responded,

> [w]e've told [Mr. Nance] in writing that we want the motel demolished. Our position is that if he evicts all the criminal types that because of the reputation of the building, the criminal type [sic] will come back and we will have the nuisance problem over and over and over again. We don't think any useful purpose would be served by encouraging him to make repairs.

(Id.)

On April 5, 2017, Defendant Robinson denied the Coordination Form, citing "legal issues between you and the City of Albemarle . . . ." (Id. ¶ 33.) After the City informed Mr. Nance that the Coordination Form had been denied, Stanly County's Permitting Director informed Defendant Robinson that Plaintiffs' County permits had been canceled and would not be regranted until the City approved the Coordination Form. (Id. ¶ 34.)

---

[2] Both parties agree that the Coordination Form must be approved before the permitting process can be completed. (Defendant City, Michael, Bowen, and Robinson's Brief in Support of Motion to Dismiss ("Defs.' Br.") (Doc. 13) at 8; Plaintiffs' Response to Defendant City, Michael, Bowen, and Robinson's Brief ("Pls.' Resp.") (Doc. 17) at 7.)

Plaintiffs allege that both the denials by the City and Stanly County were inconsistent with their normal procedures. (Id. ¶ 35.) Plaintiffs do not allege, however, that the Coordination Form was required to be issued, nor do Plaintiffs allege, as a matter of historical practice, that the form was always issued. This court therefore finds that the issuance of the Coordination Form was a matter of the exercise of the City of Albemarle's discretion. Plaintiffs had no right, vested or otherwise, to the Coordination Form.[3]

Mr. Nance evicted his last tenant on April 21, 2017, with assistance from the City of Albemarle Policy Department. (Id. ¶ 36.) Shortly after the tenants were evicted, Plaintiffs allege that Mr. Nance, "in an effort to satisfy the City, cleaned and removed furniture, carpet, pictures, and even the wallpaper in preparation for renovations to the property." (Id. ¶ 38.) Plaintiffs allege that "the property could not have been reopened until renovations were made." (Id.)

---

[3] This court's finding appears to be consistent with the City of Albemarle's administrative scheme. That scheme allows an individual to appeal the decisions of administrative officials charged with the enforcement of the zoning ordinances. City of Albemarle, North Carolina Code of Ordinances § 21.010(D), https://codelibrary.amlegal.com/codes/albemarle/latest/albemarle_nc/0-0-0-22405#JD_21.010.

Plaintiffs allege that "[p]rior to May 15, 2017, Chief Danny Bowen, Special Agent Shoaf, and Paul Whitfield presented Chucky Nance with two proposed consent judgments to resolve potential litigation over the alleged nuisance." (Id. ¶ 39.) Plaintiffs allege that one consent judgment required Plaintiffs to sell the Property to the City, while the other required Plaintiffs to demolish the Property. (Id. ¶ 40.)

Plaintiffs allege Mr. Nance appeared at a City Council meeting on May 15, 2017, where he informed the City Manager that he had evicted the last tenant and had done "everything in his March 31, 2017 letter . . . ." (Id. ¶ 41; Nance Letter (Doc. 1-2) at 1; Pls.' Resp. Br. (Doc. 13) at 3.)

At that same City Council meeting, Plaintiffs allege that Mr. Nance directly addressed Defendant Michael "out of frustration" regarding the denial of his Coordination Form, stating "Crap or get off the pot." (Compl. (Doc. 1) ¶ 44.) Plaintiffs allege that "the very next day," Defendant Michael "made the decision to file suit . . . . and directed Chief Bowen to move ahead with the lawsuit." (Id.) Plaintiffs allege that Defendant Michael "exceeded his authority" and was "without proper authorization from the City Council" when he "directed Chief Danny Bowen to proceed with the suit against Plaintiffs . . . ." (Id. ¶ 45.)

Plaintiffs allege the nuisance complaint was ultimately filed on August 4, 2017, "approximately 105 days after the cessation of all business activity at the Heart of Albemarle property and 121 days after denying Mr. Nance's request for the Coordination Form to begin improvements to the property." (Id. ¶ 64.) Plaintiffs allege that the Property was "'now and for some considerable time prior to the filing of this [nuisance] Complaint has been established, maintained, owned, leased and used by Defendants Chucky L. Nance and Jennifer Nance as a place for the purpose of' various nuisance activities." (Id. ¶ 47.) Yet, Plaintiffs allege that "for months prior to August 4, 2017," Defendants Bowen, Michael, and Shoaf "were all aware that all business operations had ceased at the Heart of Albemarle."[4] (Id. ¶ 46.) Moreover, Plaintiffs allege that Defendant Shoaf, "despite having been advised by her supervisor on or about June 20, 2017, to at least mention in the complaint that the property had been temporarily closed failed to include any mention that the business had ceased operations on the property in the complaint she drafted." (Id. ¶ 48.) Plaintiffs allege that Defendant Shoaf "sought to build community support for the

---

[4] Because a nuisance action arises from criminal activity at a particular property, see N.C. Gen. Stat. § 19-1, the fact that business activities may have ceased does not mean the nuisance had been abated.

nuisance complaint rather than investigate whether there was a nuisance," (id. ¶ 58), including by contacting "a few good business owners/preachers/community or political figures" who knew Mr. Nance. (Id.) Plaintiffs also allege that Defendant Shoaf gave Kirsten Foyles, the trustee of the bank which held the Deed of Trust for the Heart of Albemarle property, "information from Special Agent Shoaf's investigation into the Heart of Albemarle property," in order to "put pressure on Mr. Nance." (Id. ¶¶ 61-62.)

The trial court dismissed the nuisance complaint for lack of subject matter jurisdiction on May 11, 2018, (id. ¶ 65), a decision upheld by the North Carolina Court of Appeals, State on Relation of City of Albemarle v. Nance, 266 N.C. App. 353, 354, 831 S.E.2d 605, 606 (2019), review denied, 373 N.C. 585, 838 S.E.2d 182 (2020). As the North Carolina Court of Appeals noted,

> [t]he Nances do not contest the statutes and the City's charter allow the City to file and maintain a civil action for a public nuisance. They argue the city council did not vote and resolve to exercise its authority in this action. Without the city council's ordinance or resolution, the Nances argue the City has produced no evidence to show that the formal process to file suit was initiated, approved, or resolved by the city council. We agree.
>
>       . . . .
>
> The City failed to properly initiate a public nuisance action against the Nances. The City failed to follow the requirements of the statutes and ordinances

in effect or to provide evidence of outside counsel's authority to file suit on its behalf. The trial court properly concluded it lacked subject matter jurisdiction to address the City's claims against the Nances.

Id. at 360-62, 832 S.E.2d at 610-11.

In June 2018, after the trial court dismissed the nuisance complaint, Plaintiffs again applied for Coordination Form approval. (Compl. (Doc. 1) ¶ 69.) Plaintiffs allege the form was denied in August of 2018. (Id. ¶ 71.) Plaintiffs allege that Defendant City "has cited no legal authority permitting them to deny Plaintiffs the City of Albemarle Coordination Form but have only cited past problems and the City's belief that Plaintiffs' new use would be no different from the past use . . . ." (Id.) Plaintiffs' Complaint does not allege that Plaintiffs appealed the denial of the Coordination Form to the Planning and Zoning Appeals Board or to Superior Court, as permitted under Albemarle's City Ordinances. See City of Albemarle, North Carolina Code of Ordinances §§ 21.010, 21.012, https://codelibrary.amlegal.com/codes/albemarle/latest/albemarle_nc/0-0-0-22405#JD_21.010 [hereinafter "Albemarle Ordinances"].

Plaintiffs allege that "[s]ometime in February 2019, with no explanation, the City of Albemarle, finally approved Mr. Nance's renewed request" for the Coordination Form. (Compl. (Doc. 1) ¶ 73.)

-11-

B.    **Procedural History**

Plaintiffs filed their Complaint with this court on June 27, 2019. (Compl. (Doc. 1).) Plaintiffs bring several claims.

Plaintiffs' First Claim for Relief is against Defendant City for "Deprivation of Substantive and Procedural Due Process, Equal Protection, Taking Without Compensation, and Free Speech Rights" pursuant to 42 U.S.C. § 1983. (Id. ¶¶ 74-79.) Plaintiffs' Second Claim for Relief is against Defendant City for Inverse Condemnation under North Carolina law. (Id. ¶¶ 80-83.) Plaintiffs' Third Claim for Relief is against Defendant Michael individually and in his official capacity for "Deprivation of Substantive and Procedural Due Process, Equal Protection, Taking Without Compensation, and Free Speech Rights" pursuant to 42 U.S.C. § 1983. (Id. ¶¶ 84-89.) Plaintiffs' Fourth Claim for Relief is against Defendant Robinson in his individual and official capacity for "Deprivation of Substantive and Procedural Due Process, Equal Protection, Taking Without Compensation, and Free Speech Rights" pursuant to 42 U.S.C. § 1983. (Id. ¶¶ 90-96.) Plaintiffs' Fifth Claim for Relief is against Defendant Shoaf in her individual capacity only for "Deprivation of Substantive and Procedural Due Process, Equal Protection, Taking Without Compensation, and Free Speech Rights"

-12-

pursuant to 42 U.S.C. § 1983. (Id. ¶¶ 97-101.) Plaintiffs' Sixth Claim for Relief is against Defendant Bowen in his individual and official capacity for "Deprivation of Substantive and Procedural Due Process, Equal Protection, Taking Without Compensation, and Free Speech Rights" pursuant to 42 U.S.C. § 1983. (Id. ¶¶ 102-04.) Plaintiffs' Seventh Claim for Relief is against all Defendants for "Civil Conspiracy to Deprive Plaintiffs of Substantive and Procedural Due Process, Equal Protection, Taking Without Compensation, and Free Speech Rights" pursuant to 42 U.S.C. § 1983. (Id. ¶¶ 105-09.) Plaintiffs' Eighth Claim for Relief is against Defendants Bowen and Shoaf in their individual capacities for Fraud under North Carolina state law. (Id. ¶¶ 110-13.) Plaintiffs' Ninth Claim for Relief is against Defendants Bowen, Shoaf, and Michael in their individual capacities for violation of North Carolina's Unfair and Deceptive Trade Practices Act. (Id. ¶¶ 114-18.) Plaintiffs' Tenth Claim for Relief is against Defendant Michael in his individual and official capacity, Defendant Bowen in his individual and official capacity, and Defendant Shoaf individually for Malicious Prosecution under state law. (Id.

-13-

¶¶ 119-22.)[5] Plaintiffs' Eleventh Claim for Relief is for Punitive Damages against all Defendants. (Id. ¶¶ 123-27.) Finally, Plaintiffs' Twelfth Claim for Relief is against all Defendants for Civil Conspiracy to Obstruct Justice under state law. (Id. ¶¶ 128-31.)

Defendants City, Michael, Bowen, and Robinson filed a Motion to Dismiss pursuant to Rule 12(b)(6), (Doc. 10), for failure to state a claim, as well as a supporting brief. (Defs.' Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Br.") (Doc. 11).) Plaintiffs responded to Defendants City, Michael, Bowen, and Robinson's motion, (Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pls.' First Resp.") (Doc. 13)), and Defendants City, Michael, Bowen, and Robinson replied, (Defs.' Reply to Pls.' Resp. to Defs.' Mot. to Dismiss ("Defs.' Reply") (Doc. 17)). This motion to dismiss is ready for a ruling.

Defendant Shoaf filed her own Motion to Dismiss, (Doc. 14), for failure to state a claim, along with a supporting brief, (Def. Shoaf's Mem. of Law in Supp. of Mot. to Dismiss ("Def. Shoaf's Br.") (Doc. 15)). Plaintiffs responded to Defendant Shoaf's motion, (Pls.' Mem. of Law in Opp'n to Defs. Shoaf's

---

[5] Plaintiffs clarified in their briefing that their malicious prosecution claim was brought under state law, not as a § 1983 action. (Pls.' Second Resp. (Doc. 16) at 14.)

Mot. to Dismiss ("Pls.' Second Resp.") (Doc. 16)), but Defendant Shoaf did not reply. The time to reply has lapsed. LR 7.3(h). Defendant Shoaf's motion is now ripe.

Upon request of this court, Plaintiffs filed a supplemental brief regarding their Substantive Due Process claim, (Doc. 21). On November 16, 2020, this court heard oral arguments from all parties with respect to Defendants' Motions to Dismiss and the issues raised in Plaintiffs' supplemental briefing. (Minute Entry 11/16/2020.)

For the reasons stated herein, this court finds it should grant both motions as to all federal claims. This court declines to exercise supplemental jurisdiction over the remaining state law claims and will dismiss those without prejudice.

## II.  **STANDARD OF REVIEW**

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing

-15-

<u>Twombly</u>, 550 U.S. at 556–57). When ruling on a motion to dismiss, this court accepts the complaint's factual allegations as true. <u>Iqbal</u>, 556 U.S. at 678. Further, this court liberally construes "the complaint, including all reasonable inferences therefrom, . . . in plaintiff's favor." <u>Estate of Williams-Moore v. All. One Receivables Mgmt., Inc.</u>, 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004) (citation omitted). This court does not, however, accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678.

III. **<u>ANALYSIS</u>**

   A. **<u>Plaintiffs' First Cause of Action: Constitutional Claims against Defendant City</u>**

Plaintiffs' First Claim for Relief is against Defendant City for "Deprivation of Substantive and Procedural Due Process, Equal Protection, Taking Without Compensation, and Free Speech Rights" pursuant to 42 U.S.C. § 1983. (Compl. (Doc. 1) ¶¶ 74-79.)

Municipalities are liable as "persons" under 42 U.S.C. § 1983 for constitutional torts caused by the municipality. <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989). A municipality cannot be held responsible for the conduct of its officers on a theory of respondeat superior, <u>Monell v. Dep't of Soc. Servs.</u>,

-16-

436 U.S. 658, 691-95 (1978), and "[i]t is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983." City of Canton, 489 U.S. at 385 (internal modifications and quotations omitted).

To prove municipal liability, Plaintiffs must plausibly allege "(1) that the defendants acted under color of state law and (2) that the plaintiff suffered a deprivation of a constitutional right as a result of that action." Davis v. Durham Mental Health Developmental Disabilities Substance Abuse Area Auth., 320 F. Supp. 2d 378, 403 (M.D.N.C. 2004) (citing Gomez v. Toledo, 446 U.S. 635 (1980)). The "under color of state law" element requires plaintiffs to plausibly allege that an official policy or custom led to the alleged deprivation of a constitutional right. Id.

> A custom, policy, or practice can be shown in four ways:
>
> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotations and modifications omitted).

-17-

Plaintiffs allege that Defendant City, acting under color of law, "unlawfully denied Plaintiffs' requests for the City of Albemarle Coordination Form," and "interfered with the normal approval or denial process for the City of Albemarle Coordination Form."[6] (Compl. (Doc. 1) ¶ 75.)

Plaintiffs also allege that "the City of Albemarle was motivated by racial animus in preventing the construction of Section 8 housing in the highly visible Central Business District directly across the street from the location where the new police department will be constructed," (id. ¶ 76), and that "it is the custom or policy of the City of Albemarle, to unlawfully limit low income housing as it sees low income housing as an economic threat to the City," (id. ¶ 77). Finally, Plaintiffs allege that "Defendant used governmental action to unreasonably deprive Plaintiffs of their legitimate property

---

[6] Although not necessary for an analysis of municipal liability, this conclusory allegation is not plausibly pled under the standard established in Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Plaintiffs never allege what the normal approval or denial process is. As a result, this court cannot find the normal process was not followed. Plaintiffs applied for a Coordination Form. (Compl. (Doc. 1) ¶ 30.) Defendant Robinson spoke with a City attorney, then denied the form for the reasons discussed with the attorney. (Id. ¶¶ 31-33.) Plaintiffs allege no facts to suggest that there was anything abnormal about this process.

-18-

interests in derogation of their rights of due process." (Id. ¶ 78.)

Defendant City argues that Plaintiffs' Complaint fails to state a claim for municipal liability under 42 U.S.C § 1983. (Defs.' Br. (Doc. 11) at 7-11.) Defendant City argues that Plaintiffs have not plausibly alleged that they suffered a deprivation of a Constitutional or federal statutory right, (id. at 8-9), or that Plaintiffs suffered the alleged deprivation due to an action taken under color of state law, (id. at 8).

Because respondeat superior may not serve as a basis of municipal liability under § 1983, Monell, 436 U.S. at 694-95, this court examines whether Plaintiffs have plausibly established that the "municipal action was taken with the requisite degree of culpability," Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997), using the four factors indicated by the Fourth Circuit in Lytle.

### 1.   A Custom or an Express Policy

In support of their claims that Defendant City violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment, (Compl. (Doc. 1) ¶¶ 77-79), Plaintiffs allege that "it is the custom or policy of the City of Albemarle[] to unlawfully limit low income housing," (id. ¶ 77). This court finds, however, that Plaintiffs' allegations are unsupported by

-19-

specific facts that indicate that there was an express written regulation or ordinance that would limit low income housing or that the City had denied permits for low income housing in other instances. (See id. ¶¶ 13-73.)

Because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678, Plaintiffs' allegations do not lead to a reasonable inference of municipal liability for Plaintiffs' claims under a theory of an express policy or a widespread or persistent custom or usage. See Lytle, 326 F.3d at 471. Accordingly, Plaintiffs have not plausibly alleged Defendant City should be held liable for the alleged Fourteenth Amendment violations of its employees using these methods of proving municipal liability.

## 2. **Decisions of a Person with Final Policymaking Authority.**

Under the second method for proving municipal liability, a city will be held liable for the decisions of a person with final policymaking authority. Lytle, 326 F.3d at 471. "A 'final policymaker' for the purposes of municipal liability is someone who has 'the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" Id. at 472 (quoting Riddick v. Sch. Bd. of City of

Portsmouth, 238 F.3d 518, 523 (4th Cir. 2000)).

"[T]he identification of policymaking officials is a question of state law." City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988). "If an official's acts are subject to review or supervision by a municipal policymaker, that official does not have final policymaking authority." Alexander v. City of Greensboro, 762 F. Supp. 2d 764, 783 (M.D.N.C. 2011) (citing Riddick, 238 F.3d at 523-24).

This court finds that Plaintiffs have not plausibly alleged that the alleged constitutional violations resulted from the decisions of a person with final policymaking authority.

With regard to Plaintiffs' First Amendment retaliation claims, Plaintiffs argue that Defendant City's actions occurred "in violation of plaintiffs' constitutionally protected right to free speech and were done by singling plaintiffs out for illegitimate political or personal motives," when Defendant Michael directed Defendant Bowen to "move ahead" with the nuisance suit following Mr. Nance's statements at the City Council meeting. (Pl.'s First Resp. (Doc. 13) at 10.) However, according to Plaintiffs' allegations, Defendant Michael did not have "proper authorization" from the City Council to move ahead with the suit, (id.), and in doing so, Defendant Michael "exceeded his authority," (Compl. (Doc. 1) ¶ 45). Because a

-21-

final policymaker is "someone who has the responsibility and authority to implement final municipal policy with respect to a particular course of action," Lytle, 326 F.3d at 472, Plaintiffs' pleaded facts establish that Defendant Michael was not a final policymaker for the purposes of filing a nuisance action on behalf of the City of Albemarle. Accordingly, this court finds that Plaintiffs have not plausibly alleged that Defendant City is liable for alleged First Amendment retaliation which may or may not have occurred from any personal motives of Defendant Michael.

Moreover, Plaintiffs argue that Defendant City is liable where "the City and individuals within and outside the City acted in an extraordinary intervention into the normal approval processes with racially discriminatory intent and with personal motives to deny [Plaintiffs] a required Coordination Form." (Pls.' First Resp. (Doc. 13) at 8.) Defendants argue, however, that although "Defendant Robinson may have had authority to accept and act upon applications for Coordination Forms, in the normal course of the City's business, his decisions and actions are subject to review by the Planning and Zoning Appeals Board," (Defs.' Br. (Doc. 11) at 10), and thus, Defendant Robinson is not a final policymaking official "such that his actions or omissions establish municipal policy." (Id.) Plaintiffs do not

-22-

contest or contradict Defendants' assertion of state law. (See Pls.' First Resp. (Doc. 13) at 7-11.) In the absence of pleaded facts establishing that Defendant Robinson's decisions are not reviewable, this court finds that he is not a final policymaker with decision-making authority under state law and that Plaintiffs have not plausibly alleged that Defendant City is liable for any alleged wrongdoing by Defendant Robinson in denying the Coordination Form.

Because the pleaded facts do not support a reasonable inference that a custom or policy of Defendant City led to the alleged Constitutional violations, this court will dismiss all claims against Defendant City for failure to state a claim of municipal liability.

## B. **Plaintiffs' Federal Claims against Defendants Michael, Bowen, and Robinson in their Official Capacities**

In addition to Plaintiffs' claims against Defendant City, Plaintiffs' Third, Fourth, and Sixth Causes of Action raise claims of "Deprivation of Substantive and Procedural Due Process, Equal Protection, Taking without Compensation, and Free Speech Rights" under § 1983 against Defendants Michael, Bowen, and Robinson in their official capacities. (Compl. (Doc. 1) ¶¶ 84-89, ¶¶ 90-96, ¶¶ 102-04.)

-23-

"Personal-capacity suits seek to impose personal liability upon a governmental official for actions he takes under color of state law." Kentucky v. Graham, 473 U.S. 159, 165 (1985). By contrast, official-capacity suits, "generally represent only another way of pleading an action against an entity of which an officer is an agent." Id. (citing Monell, 436 U.S. at 690, n.55). Because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," id. at 166, official-capacity claims "should be dismissed as duplicative" when the entity is also named as a defendant. Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004).

Plaintiffs have brought the same claims against Defendants Michael, Bowen, and Robinson in their official capacity as against Defendant City. Accordingly, this court finds that these claims are duplicative and will dismiss all official-capacity claims against Defendants Michael, Bowen, and Robinson.

C. **Plaintiffs' Federal Claims against Defendants Michael, Bowen, Robinson, and Shoaf in their Personal Capacities**

Plaintiffs' Third, Fourth, Fifth, and Sixth Causes of Action also raise claims against Defendants Michael, Bowen, Robinson, and Shoaf in their personal capacities for "Deprivation of Substantive and Procedural Due Process, Equal Protection, Taking Without Compensation, and Free Speech Rights"

-24-

under § 1983. (Compl. (Doc. 1) ¶¶ 84-89, ¶¶ 90-96, ¶¶ 97-101, ¶¶ 102-04.)

Defendants Michael, Bowen, and Robinson move to dismiss Plaintiffs' Complaint on several grounds. First, they argue that any individual capacity claims have not been plausibly alleged since Plaintiffs' have failed to allege facts showing that Defendants personally acted to deprive Plaintiffs of any constitutional rights. (Defs.' Br. (Doc. 11) at 12.) Second, they argue that they are entitled to Qualified Immunity from § 1983 liability since Plaintiffs have not identified a clear constitutional right to the Coordination Form or to immunity from a nuisance lawsuit. (Id. at 14.)

Plaintiffs responded that "[w]here a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." (Pls.' First Resp. (Doc. 13) at 8.) Plaintiffs argue that they have plausibly alleged violations of their federal constitutional rights in the form of Defendants' denial of the Coordination Form for legally impermissible and racially discriminatory reasons, coercing Plaintiffs through the nuisance action, and retaliating for Mr. Nance's protected speech. (Id. at 8-11.) Plaintiffs also argue that all the constitutional wrongs they alleged were

-25-

clearly established at the time they were committed, meaning Defendants are not entitled to qualified immunity. (Id. at 13-14.)

Defendants Michael, Bowen, and Robinson reply that Plaintiffs' claims must be dismissed as "[t]he allegations in the Complaint are not sufficient as they amount to nothing more than conclusory allegations and impermissible unreasonable inferences." (Defs.' Reply (Doc. 17) at 2.) Defendants argue that Plaintiffs' First Amendment rights were not violated because the alleged basis of retaliation, the nuisance action, had been initiated before Mr. Nance spoke at the May 15, 2017 City Council meeting. (Id. at 4.) Defendants also argue that Plaintiffs did not suffer an unconstitutional taking since a "nuisance is an exception to a taking." (Id. at 6.) Finally, Defendants argue that Plaintiffs had no vested property rights that could serve as the basis for a procedural or substantive due process violation. (Id. at 7.)

Defendant Shoaf is being sued only in her personal capacity. (Compl. (Doc. 1) ¶¶ 97-101.) Defendant Shoaf argues first that Plaintiffs have failed to plausibly allege that she acted personally to deprive Plaintiffs of any constitutional rights. (Def. Shoaf's Br. (Doc. 15) at 4.) Defendant Shoaf also asserts her own right to Qualified Immunity against any § 1983

-26-

claims. (Id. at 6.) Defendant Shoaf argues that "Plaintiffs'
facts [] do not show that Defendant Shoaf acted unreasonably or
outside of the authority granted to her as a law enforcement
officer." (Id. at 9.)

In their response to Defendant Shoaf, Plaintiffs argue that
they have alleged facts showing that Defendant Shoaf acted
personally to pressure Plaintiffs by way of the nuisance action.
(Pls.' Second Resp. (Doc. 16) at 7–9.) Plaintiffs also argue
that the constitutional wrongs they allege were clearly
established, meaning Defendant Shoaf is not entitled to § 1983
immunity. (Id.)

This court will address each of Plaintiffs' claims under 42
U.S.C. § 1983 in turn.

### 1.   Equal Protection

This court finds that Plaintiffs have failed to plausibly
allege a violation of the Equal Protection Clause as to all
Defendants.

The Fourteenth Amendment's Equal Protection Clause states
that "[n]o State shall . . . deny to any person within its
jurisdiction the equal protection of the laws." U.S. Const.
amend. XIV, § 1. The Equal Protection Clause "is essentially a
direction that all persons similarly situated should be treated
alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432,

-27-

439 (1985). The Clause "requires that the states apply each law, within its scope, equally to persons similarly situated, and that any differences of application must be justified by the law's purpose." Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 818 (4th Cir. 1995).

An equal protection violation occurs either "(1) when the government explicitly classifies people based on race, or (2) when a law is facially neutral, but its administration or enforcement disproportionately affects one class of persons over another and a discriminatory intent or animus is shown." Monroe v. City of Charlottesville, 579 F.3d 380, 388 (4th Cir. 2009).

Proving an Equal Protection claim involves a two-step analysis. First, a plaintiff must "demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). The second part of the Equal Protection analysis is to "determine whether the disparity in treatment can be justified under the requisite level of scrutiny". Id. "The level of scrutiny depends on the type of classification." Sansotta v. Town of Nags Head, 724 F.3d 533, 542 (4th Cir. 2013).

-28-

### a. __Plaintiffs' Allegations of Unequal Treatment__

Plaintiffs do not allege that Defendants' zoning ordinances or processes for reviewing Coordination Forms are discriminatory on their face. Instead, Plaintiffs base their Equal Protection claims on the theory that the Coordination Form was denied to prevent racial minorities from living at the Property.[7] (See Compl. (Doc. 1) ¶¶ 54-55, 76.)

With facially neutral laws, "if a classification is not explicitly stated, the plaintiff bears the initial burden of proving that a classification was nonetheless intentionally utilized." Sylvia Dev. Corp., 48 F.3d at 819. A plaintiff must prove that the classification has both a discriminatory purpose and a discriminatory effect. Vill. of Arlington Heights v.

_____

[7] Assuming Plaintiffs have plausibly alleged the elements for an Equal Protection claim, Plaintiffs have standing to raise it. Although Plaintiffs do not allege that they are members of a suspect class, Plaintiffs allege that Defendants were aware that they wanted to use the Property for Section 8 housing. (Nance Letter (Doc. 1-2) at 1.) The Fourth Circuit has recognized that developers may assert the rights of prospective minority tenants victimized by alleged racial discrimination, see, e.g., Scott v. Greenville Cnty., 716 F.2d 1409, 1415-16 (4th Cir. 1983). Where "[t]he heart of [a plaintiff's] racial discrimination claim is that he was singled out for adverse treatment because defendants believed he was willing to contract with and otherwise associate with blacks and other minorities through the building of low-income housing," Plaintiffs "need neither allege nor show that members of a minority group will in fact reside in the proposed housing in order to satisfy standing requirements." Id.

-29-

Metro. Hous. Dev. Corp., 429 U.S. 252, 264-68 (1977); Washington v. Davis, 426 U.S. 229, 238-42 (1976).

"To demonstrate a Fourteenth Amendment claim, a plaintiff must demonstrate discriminatory effect by showing the unequal treatment of a person or persons as compared to other similarly situated individuals." United States v. Johnson, 122 F. Supp. 3d 272, 354 (M.D.N.C. 2015); see also Sylvia Dev. Corp., 48 F.3d at 818-19 ("Even though a state law is facially neutral, its administration or enforcement can effect an unequal application by favoring one class of persons and disfavoring another.").

"To survive a motion to dismiss, a plaintiff need not allege that the challenged action rested solely on racially discriminatory purposes . . . It is enough for a plaintiff to plausibly plead that an invidious discriminatory purpose was a motivating factor in the challenged decision." La Unión del Pueblo Entero v. Ross, 353 F. Supp. 3d 381, 393 (D. Md. 2018) (citing Arlington Heights, 429 U.S. at 265-66) (internal quotations omitted). Courts may consider both circumstantial and direct evidence of intent, including:

> (1) evidence of a "consistent pattern" of actions by
> the decisionmaking body disparately impacting members
> of a particular class of persons; (2) historical
> background of the decision, which may take into
> account any history of discrimination by the
> decisionmaking body or the jurisdiction it represents;
> (3) the specific sequence of events leading up to the

particular decision being challenged, including any
significant departures from normal procedures; and (4)
contemporary statements by decisionmakers on the
record or in minutes of their meetings.

Sylvia Dev. Corp., 48 F.3d at 819 (citing Arlington Heights, 429

U.S. at 266-68). "[A] plaintiff can survive a motion to dismiss

without independently establishing that each factor weighs in

the plaintiff's favor." Ross, 353 F. Supp. 3d at 394.

Citing Scott v. Greenville County, 716 F.2d 1409, 1416 (4th

Cir. 1983), Plaintiffs argue that "[r]acially discriminatory

local land use decisions of various kinds have long been struck

down or found actionable under the Equal Protection Clause."

(Pls.' First Resp. (Doc. 13) at 14; Pls.' Second Resp. (Doc. 16)

at 9.) Plaintiffs imply that the denial of the Coordination Form

presents the type of invidious discrimination the Fourth Circuit

warned against in Scott. (Id.) However, this court finds that

Plaintiffs' allegations regarding a role that race may have

played in Defendants' decision to deny Plaintiffs the

Coordination Form are conclusory and unsupported by the facts

alleged in the Complaint.

Although Plaintiffs argue that "[t]he City made it clear

through information it disseminated to the general public, its

denial of the plaintiffs' access to the permitting process, and

the revocation of permits already issued, that it saw affordable

-31-

housing as a threat to its plans," (Pls.' First Resp. (Doc. 13) at 9), and that Plaintiffs were "prevented from serving [sic] minority community which was racially motivated." (Id. at 9-10.) Plaintiffs' Complaint does not provide any facts indicating what Defendants might have said or done to expressly or impliedly indicate that they believed affordable housing was a threat or that they were racially motivated. Because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678, Plaintiffs' allegations regarding information disseminated by the City do not support a reasonable inference that Defendants were racially motivated.

Moreover, Plaintiffs' Complaint describes only one conversation in which racism or racial bias is explicitly or implicitly discussed. Referring to a deposition Defendants conducted for the underlying nuisance action, Plaintiffs argue that "some of [Defendants'] motives were apparent when the attorney for the Defendants and acting on their behalf became enraged during the deposition of [City Inspector] Allsbrook and upon the completion of the deposition called Mr. Allsbrook (a black male) 'a racist' in referring to Mr. Allsbrook's sworn testimony." (Compl. (Doc. 1) ¶ 54.) Plaintiffs allege that the Defendants' attorney, "directed Mr. Allsbrook to 'stop talking

-32-

about racism," and that "Defendants took no steps to distance themselves from this type of rhetoric and in fact kept their then attorney employed in the case." (Id.)

This court finds that the facts alleged about the incident do not support a reasonable inference that Defendants harbored racially discriminatory views regarding affordable housing. Although Plaintiffs argue that, by calling Mr. Allsbrook a racist, Defendants were "seeking to stop Mr. Allsbrook from expressing his views in support of Plaintiffs' attempts to support minority residents in need of affordable housing," (id. ¶ 55), Plaintiffs do not directly allege what Mr. Allsbrook said such that this court could reasonably infer whether his views regarding race discrimination in affordable housing projects had merit or, more importantly, whether the attorney's comments somehow permit an inference of racial discrimination on the part of his clients. Moreover, assuming Mr. Allsbrook expressed support for Plaintiffs' efforts to support minority residents in need of affordable housing, the actions by Defendants' attorney or the decision to retain him do not support a reasonable inference that Defendants harbored discriminatory views or that those views led to the denial of Plaintiffs' Coordination Form in the absence of any facts which might support such an inference.

-33-

Even if this court could reasonably infer invidious discrimination from the attorney's comments, which it cannot, the alleged comments from the deposition exchange during the nuisance lawsuit are unconnected to the denial of the Coordination Form. The attorney who made the comment is not a Defendant, and Plaintiffs do not allege that he played any role in the denial of the Coordination Form. Thus, Plaintiffs have not plausibly alleged that this incident is connected to the denial of the Coordination Form in any way.

Ultimately, this court finds that Plaintiffs have not alleged either direct or indirect evidence of intent which would support a reasonable inference that invidious discrimination played any role in Defendants' decision to deny Plaintiffs the Coordination Form, let alone that "an invidious discriminatory purpose was a motivating factor in the challenged decision." Ross, 353 F. Supp. 3d at 393 (citing Arlington Heights, 429 U.S. at 265-66) (internal quotations omitted).

First, Plaintiffs' Complaint does not allege that the City has engaged in a pattern of denying Coordination Forms for affordable housing. See Sylvia Dev. Corp., 48 F.3d at 819. Plaintiffs' Complaint makes no allegations, in fact, regarding how often or to whom Coordination Forms have been granted in the past.

-34-

Second, Plaintiffs do not provide historical information about housing discrimination in the City of Albemarle, see Sylvia Dev. Corp., 48 F.3d at 819, and Plaintiffs' allegations that "there continues to be a need for more Section 8 housing in the City of Albemarle," (Compl. (Doc. 1) ¶ 51), do not, without additional facts not present in Plaintiffs' Complaint, support a reasonable inference that Defendants had maliciously created a shortage of affordable housing.

Third, Plaintiffs do not allege any statements Defendants may have made contemporaneously with the decision to deny Plaintiffs the Coordination Form that lead to a reasonable inference of discrimination. See Sylvia Dev. Corp., 48 F.3d at 819. In fact, the facts alleged in Plaintiffs' Complaint support the opposite inference - that Defendants were motivated to address the underlying nuisance. Plaintiffs allege that Defendants' stated reason for denying the Coordination Form was "legal issues between [Mr. Nance] and the City of Albemarle," and that Defendant Robinson believed that, given these issues, it would not "be appropriate for my department to proceed with issuing any form of approval, zoning or otherwise. . . ." (Compl. (Doc. 1) ¶ 31.) Plaintiffs' allegations regarding an email discussion between Defendant Robinson and an attorney for the City support an inference that Defendants sought to address

-35-

the underlying nuisance. In that conversation, the attorney
stated that,

> Our position is that if he evicts all the criminal
> types that because of the reputation of the building,
> the criminal type[s] will come back and we will have
> the nuisance problem over and over and over again. We
> don't think any useful purpose would be served by
> encouraging him to make repairs.

(Id.)

Fourth, although Plaintiffs allege that the "denial of the
City Coordination form . . . [was] not in accordance with normal
practices and procedures of the City of Albemarle and Stanly
County," (id. ¶ 35), Plaintiffs do not allege what the normal
practices and procedures were, nor do they assert that they were
entitled to approval of the Coordination Form as of right.[8] For
these reasons, this court finds that any allegations regarding
"the specific sequence of events leading up to the particular
decision being challenged, including any significant departures
from normal procedures," Sylvia Dev. Corp., 48 F.3d at 819, are

---

[8] During oral arguments on November 16, 2020, Plaintiffs
implied that the denial of Plaintiffs' Coordination Form was
exceptional because it was the first time that the City had
denied a Coordination Form. In the absence of such an allegation
in the Complaint or some substantive and concrete facts to this
effect, however, this court declines to sua sponte amend the
Complaint to include this as a fact. This court will limit its
analysis to the facts alleged in Plaintiffs' Complaint, which do
not contain information about the frequency or number of
Coordination Forms requested or denied.

-36-

conclusory and unsupported by the facts alleged in the
Complaint.

Accordingly, this court finds that Plaintiffs do not
plausibly allege that Defendants acted with an unconstitutional
motivation based on race or that Defendants granted and denied
Coordination Forms based on race. Since Plaintiffs offer no
other suspect classification, this court now applies the
appropriate level of scrutiny.

b.  **Applying the Appropriate Level of Scrutiny**

"It is elementary 'that when no fundamental right or
suspect classification is at issue, the Equal Protection Clause
allows a legislative body wide latitude in drawing
classifications.'" Siena Corp. v. Mayor & City Council of
Rockville, 873 F.3d 456, 465 (4th Cir. 2017) (quoting Tri-County
Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 438 (4th Cir. 2002)).
"Such classifications are permissible so long as they are
'rationally related to a legitimate state interest.'" Id.
(quoting City of Cleburne, 473 U.S. at 440). "This analysis
looks not to the subjective motivations of the local officials.
The test is simply whether the governmental end is legitimate
and whether the means chosen to further that end are rationally
related to it." Id. (citing Front Royal & Warren Cnty. Indus.

<u>Park Corp. v. Town of Front Royal</u>, 135 F.3d 275, 290 (4th Cir. 1998)).

Plaintiffs' own allegations support the legitimate state interest in denying the Coordination Form. Defendants had already begun the process of bringing a nuisance suit against the Property. (<u>See</u> Bowen Letter (Doc. 1-1); Nance Letter (Doc. 1-2) at 1.) Defendants were worried that granting the Coordination Form would encourage the return of "criminal type[s]" meaning the City would "have the nuisance problem over and over and over again." (Compl. (Doc. 1) ¶ 31.) Defendants' concerns about safety were legitimate interests. <u>See</u> <u>Siena Corp.</u>, 873 F.3d at 464 ("[T]he Council believed [certain risks] to be associated with self-storage warehouses, among them the prospect of increased crime, traffic, and illicit drugs. Such concerns fall within the heart of the state's police power: safeguarding 'the public health, safety, morals, or general welfare.'" (quoting <u>Vill. of Euclid v. Ambler Realty Co.</u>, 272 U.S. 365, 395 (1926)).) Furthermore, Plaintiffs never plausibly allege the Property did not constitute a nuisance. To the contrary, their eviction of the lessee and tenants could

-38-

reasonably be understood otherwise.[9]

The decision to deny Plaintiffs their Coordination Form is also rationally related to the abatement of the alleged nuisance. If neither a fundamental right nor a suspect classification is at issue, "the pertinent question for determining whether the governmental action violated the Equal Protection Clause is whether [government actors] reasonably could have believed that the action was rationally related to a legitimate governmental interest." Front Royal, 135 F.3d at 290. Plaintiffs' allegations support a reasonable inference that Defendants believed the only way to abate the nuisance was to demolish or transfer the Property. Prior to May 15, 2017, Defendants offered Plaintiffs two consent judgments: to either sell the Property to the City or demolish the Property. (Compl. (Doc. 1) ¶ 40.) "Whether one agrees or disagrees with the [City's] assessment . . . is beside the point. As the local governing body, the [City] was entitled" to consider options that they thought would best promote the City's health and

_____

[9] This court is required to draw all reasonable inferences in favor of Plaintiffs, and therefore, does not draw an inference that any evictions constitute a concession of a nuisance. However, this court makes this point to illustrate the implausibility of Plaintiffs' allegations that Plaintiffs experienced a deprivation of Equal Protection under the Constitution.

-39-

safety. Siena Corp., 873 F.3d at 464. Demolishing the Property or transferring ownership would have undoubtedly abated the nuisance.

In sum, Plaintiffs have not plausibly alleged that the denial of the Coordination Form constituted disparate treatment as compared to members outside a suspect class, and Plaintiffs have failed to allege any facts supporting the conclusion that Defendants acted with discriminatory intent. Plaintiffs' allegations that Defendants acted with racial animus are not supported by plausible facts; instead, Plaintiffs rely upon conclusory allegations. This court does not, however, accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Since no suspect classification is at issue, Plaintiffs have also failed to allege facts plausibly supporting the claim that the denial of the Coordination Form was not rationally related to a legitimate state interest. For these reasons, Plaintiffs' Equal Protection Clause claims should be dismissed.

### 2. First Amendment Retaliation

Plaintiffs allege claims of First Amendment retaliation against Defendants Michael, Bowen, Robinson, and Shoaf in their individual capacities. (See Compl. (Doc. 1).) Defendants argue

that qualified immunity bars these claims. (Def. Shoaf's Br. (Doc. 15) at 6-9; Defs.' Br. (Doc. 11) at 13-15.) This court finds that qualified immunity bars Plaintiffs' claims of First Amendment retaliation against Defendants Michael, Bowen, Robinson, and Shoaf in their personal capacities.

### a. Legal Standard for Qualified Immunity

The doctrine of qualified immunity "operates to protect law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions." Raub v. Campbell, 785 F.3d 876, 880-81 (4th Cir. 2015) (citing Anderson v. Creighton, 483 U.S. 635, 638-39 (1987)). "The defense of qualified immunity is broader than a mere defense to liability. Rather, intended to 'spare individual officials the burdens and uncertainties of standing trial,' it provides for immunity from suit where a state actor's conduct is objectively reasonable under the circumstances." Id. at 881 (quoting Gooden v. Howard Cnty., 954 F.2d 960, 965 (4th Cir. 1992) (en banc)); see also Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (plurality opinion) (finding that qualified immunity is "effectively lost if a case is erroneously permitted to go to trial").

Questions of qualified immunity should be decided "at the earliest possible stage in litigation." Hunter v. Bryant, 502

-41-

U.S. 224, 227 (1991). "[Q]ualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." Raub, 785 F.3d at 881. Courts are not required to analyze both prongs of the analysis, but rather, may address the questions in the order "that will best facilitate the fair and efficient disposition of each case." Pearson v. Callahan, 555 U.S. 223, 243 (2009). This court begins its analysis by considering whether Plaintiffs have alleged a right that was clearly established at the time of the alleged violation.

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotations and alteration omitted). "The dispositive question is whether the violative nature of particular conduct is clearly established." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (internal quotations and citations omitted). "[T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (internal quotations and citations omitted). "We do not

-42-

require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." <u>Ashcroft v. al—Kidd</u>, 563 U.S. 731, 741 (2011).

> **b.** **Plaintiffs have not Plausibly Alleged a Clearly Established Constitutional Right Against First Amendment Retaliation Specific to the Context of this Litigation**

Plaintiffs allege that "[t]he First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." <u>Suarez Corp. Indus. v. McGraw</u>, 202 F.3d 676, 685 (4th Cir. 2000). (Pls.' First Resp. (Doc. 13) at 13-14.) Plaintiffs allege, without greater specificity, that the opinion in <u>Suarez</u> "clearly demonstrate[s] settled law well before this controversy arose, and plaintiffs respectfully argue, all defendants should reasonably know that . . . retaliation on the basis of free speech . . . violate[s] the plaintiffs federally protected rights." (<u>Id.</u> at 14.)

Defendants argue that, "[w]hile it is true that the law prohibits government officials from engaging in retaliatory acts in response to speech in fear of a chilling effect," (Defs.' Reply (Doc. 17) at 4), "Plaintiffs have not sufficiently identified a clearly established constitutional right that . . . [Defendants] knowingly violated." (Defs.' Br. (Doc. 11) at 14;

-43-

see also Def. Shoaf's Br. (Doc. 15) at 6 ("Plaintiffs have not adequately pled constitutional claims against Defendant Shoaf in her individual capacity.").) Moreover, Defendants argue that a reasonable officer in Defendants' positions would not have known that his or her conduct was unlawful given the context. (Def. Shoaf's Br. (Doc. 15) at 9; Defs.' Br. (Doc. 11) at 14.)

### i. Defendant Michael is Entitled to Qualified Immunity

Plaintiffs argue that Defendant Michael retaliated against Mr. Nance by directing Defendant Bowen to file a nuisance suit the day after Mr. Nance made his comment at the May 15, 2017 City Council meeting. (Compl. (Doc. 1) ¶¶ 45, 85.) Plaintiffs argue that both the fact that Defendant Michael did not have the authority to proceed with the nuisance suit without authorization from the City Council, (id. ¶ 45), and that the decision to proceed was "the very next day", (id. ¶ 44), are suggestive of intent to violate "plaintiffs' constitutionally protected right to free speech" and to "singl[e] plaintiffs out for illegitimate political or personal motives." (Pls.' First Resp. (Doc. 13) at 10.)

At the same time, Plaintiffs' other allegations make clear that the nuisance issue, and the City's threat of a lawsuit, started before the May 15, 2017 City Council meeting, (Compl.

-44-

(Doc. 1) ¶¶ 22-25), and that the City was preparing to move forward with the nuisance action as early as April 2017, (id. ¶¶ 18, 31, 33). The action had not yet been filed as of Mr. Nance's May 15, 2017 comments, (id. ¶ 39-44), because Defendants were still waiting for a response from Mr. Nance regarding "two proposed consent judgments to resolve potential litigation," (id. ¶ 39). Defendants' offer of settlement contained in the consent judgments required Plaintiffs to sell or demolish the Property.[10] (Id. ¶ 40.) Plaintiffs' Complaint establishes that Mr. Nance rejected Defendants' proposed consent judgments when he made his statement at the May 15, 2017 City Council meeting requesting the approval of his Coordination Form to move ahead with renovations. (Id. ¶ 44.)

At oral argument on November 16, 2020, Plaintiffs argued that the Fourth Circuit's opinion in Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474 (4th Cir. 2005), clearly establishes that Defendant Michael's conduct violated

---

[10] The City's offer of a consent judgment framework to resolve the matter, as described by Plaintiffs, is significant. A consent judgment requires the filing of a complaint and a civil action in which the judgment could be entered. Even if Plaintiffs had accepted the City of Albemarle's proposal, a civil action would have been filed. Therefore, assuming Plaintiffs could establish a prima facie case of retaliation, the absence of established precedent recognizing Defendant Michael's acts as retaliatory further supports application of qualified immunity.

the First Amendment. The alleged retaliation in Constantine arose when the defendant university retaliated against the plaintiff for complaining about a law exam she took and the university's grade appeals policies. 411 F.3d at 499.

Although Constantine may establish the elements for pleading a First Amendment retaliation claim generally, id., the facts in Constantine are distinct from those at issue here. That the Fourth Circuit found in Constantine that "the Eleventh Amendment poses no bar to Constantine's claims" regarding First Amendment retaliation in an academic setting, id. at 501, would not be instructive to a reasonable officer in Defendant Michael's position, who moved ahead with a nuisance lawsuit that had been contemplated for some time only one day after Mr. Nance spoke at the City Council meeting. See Saucier v. Katz, 533 U.S. 194, 205 (2001) (recognizing that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts").

The Fourth Circuit recognized in Suarez Corporation Industries that "not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." 202 F.3d at 685. Because "[d]etermining whether a plaintiff's First Amendment rights were

-46-

adversely affected by retaliatory conduct is a fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts," id. at 686, the court reviewed prior precedent regarding First Amendment retaliation, id. at 686-89.

The Fourth Circuit's focus on the context in which these cases arose underscores the level of specificity necessary to find that a First Amendment right was clearly established. For example, the court recounted that there is a clearly established right where a public employer makes decisions regarding "'promotion, transfer, recall, and hiring,' based on the exercise of an employee's First Amendment rights," id. at 686 (quoting Rutan v. Republican Party, 497 U.S. 62, 79 (1990)); where a public official "restricts the award of or terminates public benefits based on the citizen's exercise of his First Amendment rights," id. at 686-87 (citing Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 686 (1996)); or where a state commission's "conduct amounted to 'thinly veiled threats to institute criminal proceedings' against publishers who did not make efforts to stop circulating publications on a list created by the Commission," id. at 688 (citing Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 68 (1963)). By contrast, the Fourth

Circuit recognized that there was not a First Amendment violation where a borough "sent letters to a landowner encouraging, but not threatening, intimidating, or coercing, the landlord to terminate its leases with a billboard owner," even where "the landowner terminated the leases in order to curry favor with the borough." Id. at 687 (citing R.C. Maxwell Co. v. Borough of New Hope, 735 F.2d 85, 89 (3d Cir. 1984)).

The Fourth Circuit has, in other cases, provided additional guidance for the contours of a First Amendment right against retaliation arising out of threatened or actual litigation. In Deal v. Newport Datsun Ltd., 706 F.2d 141, 141-42 (4th Cir. 1983), the court did not find that a landlord's refusal to renew plaintiffs' lease of a lot in a mobile home park and the filing of litigation against them was retaliatory, even where the plaintiffs had been active in voicing tenant complaints and had written an article critical of the park's management for publication in a local newspaper. Citing the Supreme Court's decision in Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982), the Fourth Circuit found that although "plaintiffs were served with process in the ejectment action and called upon to respond in that proceeding," they had been "deprived of nothing" because "[t]hey can suffer no adverse consequences until after full trial shall have been had in the state court and a judicial

-48-

determination of the rights of the parties" has occurred. Deal, 706 F.2d at 142. The court held that "commencement of the proceeding without interference with the tenants' possession of their property or their right of possession of the leasehold, pending final judgment in the state court, infringed no [constitutional] right." Id.

Similarly, in Bell v. School Board of City of Norfolk, 734 F.2d 155 (4th Cir. 1984), in which a parent alleged a school board had retaliated against them for speaking out against a school assignment plan by filing a declaratory judgment suit declaring the plan legal, the Fourth Circuit held that "initiation of a suit seeking declaratory judgment in this instance does not rise to the level of a constitutional violation." 734 F.2d at 158.

As a factual matter, Plaintiffs' prima facie case as to retaliation is that (1) Plaintiff spoke publicly and rejected the City's offer publicly; (2) the next day, without proper authorization, Defendant Michael directed Defendant Bowen to move forward with the nuisance claim; and (3) the filing of the nuisance complaint in August 2017 was an effort to retaliate against Plaintiffs by Defendant Michael for Mr. Nance's speech, since the Complaint was filed at Defendant Michael's direction. Yet, neither the facts in Constantine, nor those of the cases

-49-

cited by the Fourth Circuit in Suarez, closely mirror the facts in the instant case to the point where the "violative nature of particular conduct" was clearly established at the time Defendant Michael acted. Mullenix, 577 U.S. at 12 (internal quotations and citations omitted). Although "general statements of the law are not inherently incapable of giving fair and clear warning to officers," the precedents cited by Plaintiffs "do not by themselves create clearly established law outside an obvious case." Kisela v. Hughes, 584 U.S. ____, ____, 138 S. Ct. 1148, 1153 (2018) (internal citations and quotations omitted).

A survey of case law outside the Fourth Circuit does not clarify whether there is a clearly established right of the sort indicated by Plaintiffs' prima facie case. For example, in Benison v. Ross, 765 F.3d 649, 660-63 (6th Cir. 2014), the Sixth Circuit held that a reasonable jury could conclude that a public university's decision to file a civil lawsuit against an employee to recover sabbatical pay because of her husband's protected First Amendment activities constituted First Amendment retaliation. By contrast, in DeMartini v. Town of Gulf Stream, 942 F.3d 1277, 1307 (11th Cir. 2019), cert. denied, ____ U.S. ____, ____ S. Ct. ____, No. 19-1436, 2020 WL 6385773 (U.S. Nov. 2, 2020), the Eleventh Circuit held that a lawsuit filed

-50-

against a law firm employee who had sought public records from the town was not retaliatory. The court held that:

> [b]ecause the speech the Town allegedly retaliated against here – the public records requests and subsequent lawsuits – was the same protected speech for which the Town filed a civil lawsuit supported by probable cause, [the plaintiff's] retaliation claim is precisely the type of claim that the Supreme Court . . . was concerned would prove indecipherable for purposes of proving causation and therefore would create a serious risk of "dubious" First Amendment retaliatory claims.

Id. (citing Lozman v. City of Riviera Beach, 585 U.S. ____, ____, 138 S. Ct. 1945, 1953 (2018)). The mixed results from the Eleventh and Sixth Circuits, combined with Fourth Circuit precedent, support a reasonable inference that this is an area of law that was not clearly established at the time Defendant Michael acted.

In sum, Plaintiffs have not brought to this court's attention, nor has this court found, any precedent which prohibits state actors from proceeding with a previously threatened civil action following an individual's exercise of a Free Speech right. In light of the Supreme Court's precedent that an officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it," Plumhoff v.

-51-

Rickard, 572 U.S. 765, 778-79 (2014), this court finds that Plaintiffs have not plausibly alleged it was a clearly established violation of constitutional law for a reasonable officer in Defendant Michael's position to continue to pursue a nuisance action following Mr. Nance's public rejection of the proposed consent judgments at the City Council meeting. Accordingly, this court will dismiss Plaintiffs' First Amendment Retaliation claim against Defendant Michael.

### ii. Defendants Shoaf, Robinson, and Bowen are Entitled to Qualified Immunity

Plaintiffs' Fourth, Fifth, and Sixth Causes of Action recite claims of First Amendment Retaliation against Defendants Shoaf, Robinson, and Bowen. (Compl. (Doc. 1) ¶¶ 90-104.) In addition to the factual issues presented in the claims against Defendant Michael with regard to identifying a clearly established right, see discussion supra Part III.C.2.i., Plaintiffs face an additional factual twist in that Plaintiffs allege that Defendants Bowen, Robinson, and Shoaf acted on the nuisance complaint only after Defendant Michael directed them to proceed. (Compl. (Doc. 1) ¶¶ 45-49.) This court finds that neither Plaintiffs' assertions of constitutional precedent, nor the facts incorporated therein, indicate a constitutional right that these Defendants may have violated.

-52-

First, Plaintiffs allege that Defendant Bowen "wrongfully and with reckless disregard to Plaintiff's rights caused a nuisance complaint alleging an active nuisance to be filed." (Id. ¶ 103.) Yet, Plaintiffs do not point to a precedent that indicates that Defendant Bowen violated a clearly established constitutional right when he followed Defendant Michael's direction to assist in the filing of a nuisance action that had been in progress for several months. (See Pls.' First Resp. (Doc. 13) at 10).

Second, with regards to Plaintiffs' claim against Defendant Robinson, the substance of Plaintiffs' allegations are directed only to his participation in the denial of the Coordination Form, and do not allege that he was part of the effort to file a nuisance action, the incident at the heart of Plaintiffs' First Amendment Retaliation claim. (Id. ¶¶ 91-95.) Thus, Plaintiffs do not identify how his participation only in the denial of the Coordination Form violated a clearly established constitutional right against First Amendment Retaliation.

Finally, with regards to Defendant Shoaf, Plaintiffs allege that she sought "to build community support for a nuisance action rather than conducting a valid investigation" and revealed "confidential investigative information to Kirsten Foyles at First Bank in an attempt to pressure Mr. Nance . . .

-53-

into a favorable settlement for the Defendants." (Id. ¶ 98.)
Although Plaintiffs allege that, in doing so, Defendant Shoaf
was "acting under color of law to deprive Plaintiffs of their
constitutional right to free speech," Plaintiffs' allegations
are conclusory, as Plaintiffs do not indicate a precedent which
indicates that, given the context in which her actions occurred,
Defendant Shoaf violated a clearly constitutional right. (See
Pls.' First Resp. (Doc. 13) at 10).

Qualified immunity "gives ample room for mistaken
judgments," Malley v. Briggs, 475 U.S. 335, 343 (1986), and
protects "all but the plainly incompetent or those who knowingly
violate the law," id. at 341. "Officials are not liable for bad
guesses in gray areas; they are liable for transgressing bright
lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.
1992). "[I]f no right is transgressed, our inquiry ends, because
government officials cannot have known of a right that does not
exist." Porterfield v. Lott, 156 F.3d 563, 567 (4th Cir. 1998).

Accordingly, in the absence of clearly established law,
this court will dismiss Plaintiff's claims of First Amendment
retaliation against Defendants Michael, Bowen, Robinson, and
Shoaf in their personal capacities.

-54-

### 3. **Procedural Due Process**

This court finds that Plaintiffs have not plausibly alleged a procedural due process claim against any Defendant and that qualified immunity bars Plaintiffs' claims.

#### a. **Plaintiffs' Claims on their Merits**

To state a procedural due process claim, a plaintiff must: (1) "demonstrate that he had a constitutionally cognizable life, liberty, or property interest"; (2) "he must show that the deprivation of that interest was caused by some form of state action"; and (3) "he must prove that the procedures employed were constitutionally inadequate." Sansotta, 724 F.3d at 540 (internal quotation marks and citations omitted). This court assumes, arguendo, the first two elements and focuses on the third: whether the procedures were constitutionally adequate.[11] This court finds that they were.

_____

[11] It does not seem, however, that Plaintiffs had a property interest in the Coordination Form. See Sylvia Dev. Corp., 48 F.3d at 826 ("According to Calvert County Zoning Ordinance § 4-302, the creation of a TZD at any particular location in the County is discretionary with the County Board. Thus, Sylvia Development cannot claim entitlement to a TZD on its property, and approval of a TZD accordingly cannot be claimed by Sylvia Development as a property interest."). Plaintiffs' allegations regarding the Coordination Form's precise contents and purpose are vague and Defendants' briefing does not assist the court in determining where the Coordination Form falls in the City's
(Footnote continued)

"Due process of law generally requires that a deprivation of property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Tri-County Paving, 281 F.3d at 436 (quoting Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 313 (1950)). "However, 'to determine whether a procedural due process violation has occurred, courts must consult the entire panoply of predeprivation and postdeprivation process provided by the state.'" Id. (quoting Fields v. Durham, 909 F.2d 94, 97 (4th Cir. 1990)). "The procedures due in zoning cases, and by analogy due in cases such as this one involving regulation of land use through general police powers, are not extensive." Id.

In Tri-County Paving, the Fourth Circuit affirmed a district court's summary judgment dismissal of a procedural due process claim. The plaintiff alleged that the defendant had violated its procedural due process rights when it denied its

_____

ordinance scheme. At oral arguments on November 16, 2020, however, all parties agreed that Defendants have discretion in granting a Coordination Form, meaning Plaintiffs' had no legitimate property interest in the Form. Cf Scott, 716 F.2d at 1418 (finding that the plaintiff had a "cognizable property interest, rooted in state law," to the permit for a multi-family housing project, as the project "fully complied with the requirements of the zoning ordinance in effect as of the date on which he formally applied," and the state law did not permit discretion for those projects that complied with the zoning requirements).

permit to build an asphalt plant. Id. at 433. In discussing the process the county provided, the court noted that:

> [t]he County provided [the plaintiff] with an abundance of predeprivation process. First, there is no evidence that [the plaintiff] was denied the opportunity to submit the documentation necessary to qualify for a building permit. [The plaintiff's employees were] allowed full access to the County Building Inspector's office on numerous occasions and the [employees] often spoke directly with Robert Reed, the Director of Building Inspections, regarding [the plaintiff's] permit application. [One employee] stated in deposition testimony that he and [another employee] applied for a permit "several times in October and November 1998 and many times after that" and "would just drop in [at Reed's office] and tell them we needed a building permit." [Another employee] similarly testified that he and [another employee] "asked for a building permit on many occasions."

Id. at 436–37. Employees for the plaintiff company in Tri-County Paving also had a chance to advocate for their permits at county meetings, and "certainly conducting open community meetings and giving affected parties the opportunity to speak on behalf of their project is constitutionally sufficient." Id. at 437.

As for postdeprivation process, the Fourth Circuit explained that "[p]ostdeprivation process was likewise available. And a 'due process violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.'" Id. (quoting Fields, 909 F.2d at 98). With that, the court noted that the plaintiff failed to take advantage of the numerous

-57-

postdeprivation mechanisms available to it, to include "remedies available to it in the state courts . . . ." Id. at 438. "[The plaintiff] chose not to pursue any of these avenues of relief in the state courts. It therefore cannot complain now that the state did not provide adequate procedures." Id.; see also Raynor v. Town of Chapel Hill, No. 1:18CV291, 2019 WL 503443, at *8 (M.D.N.C. Feb. 8, 2019) ("Plaintiffs submitted a written application for a Certificate, met with Board members informally in advance of consideration of the Certificate, attended public meetings to present their claim, received a decision from which they did not appeal, submitted a new application that was later denied, and appealed the adverse decision to the Board of Adjustments (where they had success), with a further ability to appeal to the state courts.").

There are several similarities between the facts in Tri-County Paving and Plaintiffs' allegations.

Beginning with predeprivation due process, Plaintiffs were given access to Defendant Robinson, who was then the Director of Planning and Zoning for the City of Albemarle. (Compl. (Doc. 1) ¶¶ 7, 31.) Mr. Nance was also given the opportunity to speak at several City Council meetings, to include the May 15, 2017 meeting when he again asked to have the Coordination Form approved. (Id. ¶¶ 18, 42.) Indeed, Plaintiffs allege that

-58-

Mr. Nance "has appeared at several City Council meetings and before city boards and departments seeking clarification of zoning ordinances and other questions involving city ordinances and other questions involving city ordinances and regulations." (Id. ¶ 43.) Plaintiffs were also allowed to apply multiple times, as in Tri-County Paving. (Id. ¶¶ 71, 73.) "The procedures due in zoning cases, and by analogy due in cases such as this one involving regulation of land use through general police powers, are not extensive." Tri-County Paving, 281 F.3d at 436. Thus, the facts alleged by Plaintiffs support a reasonable inference that the predeprivation process was sufficient in this case.

This court also finds that the postdeprivation process was sufficient, although, as in Tri-County Paving, Plaintiffs do not allege that they took advantage of it. The City of Albemarle has established a Planning and Zoning Appeals Board that, among other duties,

> shall hear and decide requests for variances and appeals of decisions of administrative officials charged with enforcement of the ordinance. As used in this section, the term "decision" includes any final and binding order, requirement, or determination. The Planning and Zoning Appeals Board shall follow quasi-judicial procedures when deciding appeals and requests for variances. The Board shall hear and decide all matters upon which it is required to pass under any statute or ordinance that regulates land use or development.

-59-

https://codelibrary.amlegal.com/codes/albemarle/latest/albemarle

_nc/0-0-0-22405#JD_21.010 (Albemarle Ordinance § 21.010)

(emphasis added). Further,

> [e]very quasi-judicial decision of the Planning and
> Zoning Appeals Board shall be subject to review by the
> Superior Court by proceedings in the nature of
> certiorari pursuant to G.S. 160A-393. A petition for
> review shall be filed with the Clerk of Superior Court
> by the later of 30 days after the decision is
> effective, or after a written copy thereof is given in
> accordance with G.S. 160A-393(c)(1). When first-class
> mail is used to deliver notice, three days shall be
> added to the time to file the petition.

https://codelibrary.amlegal.com/codes/albemarle/latest/albemarle

_nc/0-0-0-22436 (Albemarle Ordinance § 21.012). Finally,

Plaintiffs also had the ability to appeal beyond any City

organization and enter the state courts by appealing to the

superior court where:

> 'the superior court sits as an appellate court, and
> not as a trier of facts,'" Bailey & Assocs., Inc. v.
> Wilmington Bd. of Adjustment, 202 N.C. App. 177, 189,
> 689 S.E.2d 576, 585 (2010) (quoting Overton v. Camden
> Cnty., 155 N.C. App. 391, 393, 574 S.E.2d 157, 160
> (2002)), and its scope of review is limited to the
> following:
>
> > "(1) review the record for errors of law;
> > (2) ensure that procedures specified by law
> > in both statute and ordinance are followed;
> > (3) ensure that appropriate due process
> > rights of the petitioner are protected,
> > including the right to offer evidence,
> > cross-examine witnesses, and inspect
> > documents; (4) ensure that the decision is
> > supported by competent, material, and

> substantial evidence in the whole record;
> and (5) ensure that the decision is not
> arbitrary and capricious."

NCJS, LLC v. City of Charlotte, 255 N.C. App. 72, 76, 803 S.E.2d 684, 688 (2017) (quoting Cary Creek Ltd. v. Town of Cary, 207 N.C. App. 339, 341–42, 700 S.E.2d 80, 82–83 (2010)).

Plaintiffs allege that on April 5, 2017, "Director of Planning & Development Services Kevin Robinson issued a letter to Chucky Nance denying the coordination form . . . ." (Compl. (Doc. 1) ¶ 33.) Mr. Nance did return to the City Council meeting on May 15, 2017, but Plaintiffs do not allege that they ever appealed Defendant Robinson's decision to the Zoning Board or to the Superior Court. "[The plaintiffs] chose not to pursue any of these avenues of relief in the state courts. [They] therefore cannot complain now that the state did not provide adequate procedures." Tri-County Paving, 281 F.3d at 438.

Finally, there is one notable difference between Tri-County Paving and the present case. Although Plaintiffs allege that Defendants did not follow their own procedures in some regards, (Compl. (Doc. 1) ¶ 94), and that Defendants may have had ulterior motives for doing so, (id. ¶ 24), Plaintiffs do not allege that those procedures deprived them of their ability to appeal Defendants' decisions to the superior court where such motivations would not have been present. See Sunrise Corp. of

-61-

Myrtle Beach v. City of Myrtle Beach, 420 F.3d 322, 328 (4th

Cir. 2005) ("But we have made it clear that a violation of state

law is not tantamount to a violation of a federal right.").

"[P]rocedural due process does not require certain results

— it requires only fair and adequate procedural protections."

Tri-County Paving, 281 F.3d at 436. The procedures available to

Plaintiffs regarding the Coordination Form were adequate. For

that reason, this court finds that Plaintiffs have failed to

plausibly allege any procedural due process violations,[12] and

this court will dismiss Plaintiffs' Procedural Due Process

claims on their merits.

### b. Qualified Immunity

In addition, this court will dismiss Plaintiffs' Procedural

Due Process claims on qualified immunity grounds.

Plaintiffs argue, correctly, that "qualified immunity

shields government officials from personal liability" under

§ 1983 "insofar as their conduct does not violate clearly

established statutory constitutional rights of which a

---

[12] What is more, Plaintiffs eventually received the
Coordination Form approval they sought. (Compl. (Doc. 1) ¶ 73.)
"While it is true that there were several levels of judicial and
administrative review, plaintiffs received the very remedy they
sought, the permit to develop the property." Sunrise Corp. of
Myrtle Beach, 420 F.3d at 328.

-62-

reasonable person would have known." (Pls.' First Resp. (Doc.
13) at 13; Pls.' Second Resp. (Doc. 16) at 9 (citing Toomer v.
Garrett, 155 N.C. App 462, 473, 574 S.E.2d 76, 86 (2002)).) In
support of their claim that the rights allegedly violated were
clearly established, Plaintiffs argue that "[b]y requiring the
government to follow appropriate procedures when its agents
decide to 'deprive any person of life, liberty, or property,'
the Due Process Clause promotes fairness in such decisions."
(Pls.' Second Resp. (Doc. 16) at 10 (citing Daniels v. Williams,
474 U.S. 327, 331 (1986)).)

Plaintiffs' general recitation of the protections of the
Due Process Clause does not, however, demonstrate that the right
Defendants allegedly violated was clearly established at the
time they acted. Plaintiffs' discussion of the Due Process
Clause in their response to both motions to dismiss is limited
to a discussion of substantive due process guarantees. (See
Pls.' First Resp. (Doc. 13) at 14 ("In general, substantive due
process protects the public from government action that [1]
unreasonably deprives them of [2] a liberty or property
interest."); Pls.' Second Resp. (Doc. 16) at 10 ("And it has
long been held that state officers are not entitled to
intentionally submit false evidence or withhold material
evidence from a tribunal.").) This is a claim for procedural due

process, not substantive due process, and thus, Plaintiffs' recitation of this precedent is inapposite. Plaintiffs do not offer additional precedent which would support a finding that there was a clearly established procedural due process right based on the specific context in which Plaintiffs' claims arose. Mullenix, 577 U.S. at 12 (finding that "[t]he dispositive question is whether the violative nature of particular conduct is clearly established" (internal quotations omitted)).

Because Plaintiffs' Complaint has not alleged an existing precedent which could "place[] the statutory or constitutional question beyond debate," al-Kidd, 563 U.S. at 741, this court finds that Plaintiffs' Procedural Due Process claims are barred by qualified and will dismiss them.

### 4. Substantive Due Process

This court also finds that Plaintiffs have failed to plausibly allege a substantive due process violation as to all Defendants both because Plaintiffs do not plausibly allege a claim upon which relief can be granted and because qualified immunity protects Defendants from liability.

#### a. Merits of Plaintiffs' Substantive Due Process Claims

In supplemental briefing submitted to this court regarding Plaintiffs' substantive due process claims, Plaintiffs argue

-64-

that "Plaintiffs claim a liberty and property interest, to be free from the arbitrary and personal abuse of executive power," which was "motivated by bad faith and employ[ed] the powers of the state and its instrumentalities to oppress, target, injure, and try to obtain plaintiffs' property through the unlawful use of state action." (Pls.' Mem. of Law Regarding Specific Liberty or Property Interest that is the Source of Substantive Due Process Right ("Pls.' Suppl. Mem.") (Doc. 21) at 2.)

The Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government,'" Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845 (1998) (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)), which includes "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." Id. at 846. "[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." Id. at 847 (internal quotations and citations omitted). The "constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." Id. at 848. As

-65-

a result, "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," id., and "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," id. at 849.

This court must first determine whether Plaintiffs "possessed a property interest . . . that is cognizable under the Fourteenth Amendment's Due Process Clause. If there is no cognizable property interest, there is no need to reach the question of whether a purported deprivation was arbitrary or capricious." Gardner v. City of Baltimore Mayor & City Council, 969 F.2d 63, 68 (4th Cir. 1992) (internal citations omitted). This property right determination is governed by state law. Id. "As the Supreme Court has explained: 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" Id. (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).

> Several circuits have applied Roth's claim of entitlement standard to substantive due process challenges to municipal land-use decisions. Under this approach, whether a property-holder possesses a legitimate claim of entitlement to a permit or

-66-

> approval turns on whether, under state and municipal
> law, the local agency lacks <u>all</u> discretion to deny
> issuance of the permit or to withhold its approval.
> Any significant discretion conferred upon the local
> agency defeats the claim of a property interest. Under
> this standard, a cognizable property interest exists
> only when the discretion of the issuing agency is so
> narrowly circumscribed that approval of a proper
> application is virtually assured. Moreover, the
> standard focuses on the amount of discretion accorded
> the issuing agency by law, not on whether or to what
> degree that discretion is actually exercised.

<u>Id.</u> (internal quotation marks omitted). Further, even "if in a

particular case, objective observers would estimate that the

probability of issuance was extremely high, the opportunity of

the local agency to deny issuance suffices to defeat the

existence of a federally protected property interest." <u>Id.</u>

     As explained by the <u>Gardner</u> court, this rule is consistent

with the Fourth Circuit's decision in <u>Scott v. Greenville

County</u>, 716 F.2d 1409 (4th Cir. 1983), in which the Fourth

Circuit determined that the county was required by state law to

issue a building permit, because in <u>Scott</u>, state law did not

leave room for any discretion by a state executive agency.

<u>Gardner</u>, 969 F.2d at 68. Consistent with the court's holding in

<u>Scott</u>, the court in <u>Gardner</u> held that where municipal

authorities lack discretion to deny issuance of a permit, a

property right exists, but that where state law permits

authorities to use discretion to refuse to issue a permit, there

is "no protectible property interest in the permit." Gardner,
969 F.2d at 69; accord Pulte Home Corp. v. Montgomery Cnty., 909
F.3d 685, 692 (4th Cir. 2018) ("Just last year, in Siena Corp.
v. Mayor & City Council of Rockville, Maryland, 873 F.3d 456,
463 (4th Cir. 2017), this court reiterated the longstanding rule
that any 'significant discretion' left to 'zoning authorities
defeats the claim of a property interest.'").

Plaintiffs argue that the City was aware of their plans to
renovate the Property for affordable housing and that
"defendants in a coordinated effort, through Chief Bowen,
notified Plaintiffs they were required to abate an alleged
nuisance within 45 days." (Pls.' Suppl. Mem. (Doc. 21) at 2.)
Moreover, Plaintiffs argue that "Defendants required plaintiffs
to abate the alleged nuisance while coordinating to deny them
permission to improve the property, unlawfully causing the
revocation of already issued permits, and sought to obtain the
property for the City when that was not an option available
under the statute." (Id. at 2-3.)

This court disagrees, finding that Plaintiffs did not have
a property interest in the Coordination Form or the building

-68-

permits they sought.[13] Plaintiffs do not allege, nor do they argue in their briefing, that they were entitled to the Coordination Form as a matter of state law. Plaintiffs do allege that multi-family housing is permitted in the City's Central Business District and that Defendants did not provide a legal reason for denying the Coordination Form. (Compl. (Doc. 1) ¶ 94.) Plaintiffs are correct that multi-family housing is permitted in the Central Business District, see Albemarle Ordinances § 92.083(B)(44), https://codelibrary.amlegal.com/codes/albemarle/latest/albemarle_nc/0-0-0-9952#JD_92.083, but that such buildings are permitted does not mean Defendants had no discretion in granting the Coordination Form.

The Albemarle Ordinances do not specifically mention a Coordination Form. However, under Chapter 92, the City's Zoning Regulations, the ordinances state that "[a] zoning vested right shall be deemed established upon the valid approval, or conditional approval, by the City Council as applicable, of a

---

[13] The property interest analysis for a Fifth Amendment taking is not the same as the analysis for substantive due process claims. See Scott, 716 F.2d at 1421 ("Although we view Scott as having held an entitlement to permit issuance which was sufficiently a 'species of property' to require constitutional protection, the permit, until it is at least actually in hand, is not in the nature of interests the deprivation of which is encompassed by the Fifth Amendment 'takings' doctrine.").

site specific development plan, following notice and public

hearing." Albemarle Ordinance § 92.122,

https://codelibrary.amlegal.com/codes/albemarle/latest/albemarle

_nc/0-0-0-10516. A "Zoning Vested Right" is defined as "[a]

right pursuant to G.S. 160A-385.1 to undertake and complete the

development and use of property under the terms and conditions

of an approved site specific development plan." Albemarle

Ordinance § 92.121, https://codelibrary.amlegal.com/codes/

albemarle/latest/albemarle_nc/0-0-0-10510. This ordinance

language indicates that the Coordination Form is part of a "site

specific" development plan, and that plan is subject to approval

of the City Council. This is sufficient discretion to conclude

that Plaintiffs did not have a vested property right in the

Coordination Form. Gardner, 969 F.2d at 68.

This court reaches the same conclusion after reviewing the

relevant state law regarding vested property rights and zoning

ordinance changes. At the time Plaintiffs sought the

Coordination Form, there were three ways for a

> person to establish a vested right to develop property
> in North Carolina. Two are statutory and one arises
> under the common law. The first involves obtaining a
> building permit prior to the passage of an
> ordinance. N.C. Gen. Stat. § 160A-385(b). The second
> requires obtaining approval for a "site-specific
> development plan" from a city after a proper public
> hearing. Id. and N.C. Gen. Stat. § 160A-385.1.
> Finally, there exists a common law right to develop

property if (1) the property owner makes substantial
expenditures on a property prior to the passage of an
ordinance, (2) these expenditures were made in good
faith, (3) the property owner acted with reasonable
reliance on a valid governmental approval for the
project, and (4) complying with the new ordinance
would harm the landowner. Koontz v. Davidson County
Bd. of Adjustment, 130 N.C. App. 479, 481, 503 S.E.2d
108, 109, rev. denied, 349 N.C. 529, 526 S.E.2d 177
(1998).

Molamphy v. Town of S. Pines, No. 1:02CV00720, 2004 WL 419789,

at *15 (M.D.N.C. Mar. 3, 2004);[14] see also Raynor, 2019 WL

503443, at *7 ("In Mays-Ott, Inc. v. Town of Nags Head, 751 [F.]

Supp. 82 (E.D.N.C. 1990), the court found that the plaintiff had

established a claim for deprivation of a vested property right

where the plaintiff had a valid permit and had made substantial

expenditures in reliance on the permit."); Griffin v. Town of

Unionville, No. 3:05-cv-514-RJC, 2008 WL 697634, at *8 (W.D.N.C.

Mar. 11, 2008), aff'd, 338 F. App'x 320 (4th Cir. 2009); MLC

Auto., LLC v. Town of S. Pines, No. 1:05CV1078, 2007 WL 9757526,

at *8 (M.D.N.C. May 15, 2007); Browning-Ferris Indus. of S.

Atl., Inc. v. Wake Cnty., 905 F. Supp. 312, 318-19 (E.D.N.C.

1995). Though these state laws deal with zoning ordinances, the

Coordination Form appears to be a function of the City of

Albemarle's Planning and Development Services, (Compl. (Doc. 1)

---

[14] The statutory provisions cited by Molamphy were repealed
after February 2019, when Plaintiffs were finally granted their
Coordination Form. See 2019 N.C. Sess. Laws 2019-111 (S.B. 355).

¶ 31), making it a function of the City's Zoning powers. None of the three ways of vesting property rights in a building permit applies to Plaintiffs' case.

First, Plaintiffs were not granted the Coordination Form only to have Defendants rescind it or make a different zoning determination, and therefore, no permit was issued prior to passage of an ordinance. Second, Plaintiffs never received approval for a "site specific development plan" from the City after a proper public hearing, meaning the second statutory provision did not apply. Third, Plaintiffs did not make substantial improvements before the Coordination Form was denied. Instead, Plaintiffs began to prepare the Property for renovations after the Coordination Form was denied one time and after Plaintiffs did not receive a response from Defendants about Plaintiffs' proposed renovation plans. (Compl. (Doc. 1) ¶¶ 27, 33, 38.) Plaintiffs' "attempts to blame [D]efendants for [their] failure to vest [their] property right cannot succeed in light of the [allegations] in front of the Court." Molamphy, 2004 WL 419789, at *16.

Accordingly, this court finds Plaintiffs have failed to plausibly allege a constitutionally protected property interest in the City of Albemarle Coordination Form or the building permits. Plaintiffs' substantive due process claim should be

-72-

dismissed.[15] See Griffin, 2008 WL 697634, at *8 ("Based on the record in this case, the Court concludes that the plaintiffs' 1997 [Special use permit ("SUP")] did not give them a zoning permit for an industrial solid waste landfill. Even if they did have a proper SUP, however, the plaintiffs have never obtained any of the other authorizations for an industrial solid waste landfill that are required by North Carolina law. Therefore, they cannot have spent money in good faith or in reasonable reliance on their SUP, and cannot have a vested right to such a landfill.").

### b.  **Qualified Immunity**

Alternatively, this court will dismiss Plaintiffs' Substantive Due Process claims on qualified immunity grounds.

Citing State v. Joyner, 286 N.C. 366, 371, 211 S.E.2d 320,

---

[15] Even if Plaintiffs had some entitlement to the Coordination Form, a substantive due process violation only exists if the "State deprivation of a protected property interest violates substantive due process only if it is 'so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.'" Siena Corp. v. Mayor & City Council of Rockville, 873 F.3d 456, 463-64 (4th Cir. 2017) (quoting Rucker v. Harford Cnty., 946 F.2d 278, 281 (4th Cir. 1991) (emphasis added). As addressed infra Section III.B.3, Plaintiffs could have appealed the zoning decisions to superior court, a body independent of and distinct from Defendants and their alleged ulterior motives.

-73-

323 (1975), Plaintiffs argue that "[s]ubstantive due process
. . . demands that the law shall not be unreasonable, arbitrary
or capricious, and that the law be substantially related to the
valid object sought to be obtained." (Pls.' First Resp. (Doc.
13) at 14; Pls.' Second Resp. (Doc. 16) at 9.) Plaintiffs also
cite Toomer v. Garrett, 155 N.C. App. 462, 474, 574 S.E.2d 76,
87 (2002) for the proposition that "[a]rbitrary acts that have
an abusive purpose and lack legitimate justification violate due
process." (Pls.' First Resp. (Doc. 13) at 14; Pls.' Second Resp.
(Doc. 16) at 9-10.) Plaintiffs argue that, regarding Defendant
Shoaf's conduct specifically, "it has long been held that state
officers are not entitled to intentionally submit false evidence
or withhold material evidence from a tribunal." (Pls.' Second
Resp. (Doc. 16) at 10 (citing Taylor v. Deaver, No. 5:11-CV-341-
H, 2012 WL 12905868 (E.D.N.C. Sept. 28, 2012); Evans v.
Chalmers, 703 F.3d 636 (4th Cir. 2012)).) Plaintiffs argue that
"[t]he above cases clearly demonstrate settled law well before
this controversy arose" and that "all defendants should
reasonably know that . . . arbitrary and capricious acts under
the color of law violate the plaintiffs federally protected
rights." (Pls.' First Resp. (Doc. 13) at 14.)

　　　This court disagrees. Because "[t]he dispositive question
is whether the violative nature of _particular_ conduct is clearly

-74-

established," Mullenix, 577 U.S. at 12 (internal quotations and citations omitted), Plaintiffs' cited precedents are inapplicable, as the facts are distinct from those in this case.

In Chalmers, former members of a university lacrosse team alleged police officers had mishandled false rape charges made against them. 703 F.3d at 641-42. In Taylor, a man who was convicted of murder alleged that defendants, analysts at the state's Bureau of Investigation, had intentionally misrepresented test results conducted as part of the investigation. 2012 WL 12905868, at *3. In Toomer, a former state government employee alleged that defendants had improperly disseminated the contents of his state personnel file. 155 N.C. App. at 466, 574 S.E.2d at 82. In Joyner, a criminal defendant who had been convicted of operating a building materials salvage yard in violation of a zoning ordinance alleged that the zoning ordinance violated the Due Process clause. 286 N.C. at 371-72, 211 S.E.2d at 323-24. The facts in the cases cited by Plaintiffs are too dissimilar to those in the instant case, in which Plaintiffs were denied a city Coordination Form while simultaneously addressing nuisance allegations related to the Property, to support a reasonable inference that the right claimed by Plaintiffs was clearly established at the time of the alleged violation.

Accordingly, this court finds that Plaintiffs have not identified a precedent which establishes that the substantive Due Process right asserted by Plaintiffs was clearly established at the time of the violation. This court will dismiss Plaintiffs' claims, as they are also barred by qualified immunity.

### 5. **Fifth Amendment Taking**

This court finds that Plaintiffs have failed to allege a taking under the Fifth Amendment of the U.S. Constitution against any Defendant.

The Fifth Amendment forbids the taking of private property "for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to the states. See Chicago, B. & Q. R. Co. v. City of Chicago, 166 U.S. 226, 262-63 (1897).

In addition to the "paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property," there are two kinds of "categorial" regulatory takings. Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537-38 (2005). The first involves physical invasion of the property — when a physical invasion occurs, there is a taking "no matter how slight the invasion or how weighty the public interest advanced to support them." Front Royal, 135 F.3d at 285.

-76-

Plaintiffs here do not allege such a physical taking, but instead allege the second type of regulatory taking, which involves government "regulations that deny 'all economically beneficial or productive use of land . . . .'" Id. (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992)).

> [I]t is clear that a taking exists where the owner of real property is forced to "sacrifice all economically beneficial uses . . . , that is, to leave his property economically idle." Lucas, 505 U.S. at 1019. It is also clear that temporary, but total, regulatory takings are compensable. See First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 321 (1987).

Id.[16]

"A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself

---

[16] Beyond those "per se" regulatory takings, Lingle, 544 U.S. 538, there is also a category of regulatory takings that is more nuanced. Those takings are less than total and are assessed according to the factors "set forth in Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S. Ct. 2646, 57 L.Ed.2d 631 (1978)." Lingle, 544 U.S. at 538. "To determine whether a taking has occurred, courts consider the following: (1) the economic impact of the regulation; (2) the extent to which the regulation interferes with distinct investment-backed expectations; and (3) the character of the governmental action." Adams v. Vill. of Wesley Chapel, No. 3:03cv411, 2006 WL 2689376, at *3 (W.D.N.C. Sept. 18, 2006), aff'd, 259 F. App'x 545 (4th Cir. 2007). Plaintiffs do not allege any facts allowing the court to determine if they have plausibly alleged a taking in this category. Plaintiffs' allegations expressly invoke the type of taking that denies all economic benefit. (See, e.g., Compl. (Doc. 1) ¶ 82.) Therefore, the court does not analyze this type of taking.

-77-

'take' the property in any sense . . . ." <u>United States v.</u>
<u>Riverside Bayview Homes, Inc.</u>, 474 U.S. 121, 127 (1985); <u>Nollan</u>
<u>v. Cal. Coastal Comm'n</u>, 483 U.S. 825, 845 n.2 (1987). "Moreover,
even if the permit is denied, there may be other viable uses
available to the owner. Only when a permit is denied and the
effect of the denial is to prevent 'economically viable' use of
the land in question can it be said that a taking has occurred."
<u>Riverside Bayview Homes</u>, 474 U.S. at 127. "As a general rule, a
delay in obtaining a building permit is not a taking but a non-
compensable incident of ownership." <u>Sunrise Corp. of Myrtle</u>
<u>Beach</u>, 420 F.3d at 330.

Plaintiffs have failed to plausibly allege that Defendants
took the Property without compensation in violation of the Fifth
Amendment. Plaintiffs allege that "the Defendants were demanding
that Plaintiffs address conditions on the property, while at the
same time preventing Plaintiffs from making the changes they
were demanding." (Compl. (Doc. 1) ¶ 52.) Plaintiffs allege that
shortly after the tenants were evicted on April 21, 2017,
Mr. Nance began removing furniture, wallpaper, carpet, and
pictures from the Property to satisfy the City; as a result,
"the property could not have been reopened until renovations
were made." (<u>Id.</u> ¶ 38.) Plaintiffs claim "the Defendants
controlled not only the ability to improve the property, the

-78-

ability to stop any such improvements, the ability to threaten a nuisance lawsuit for failure to improve the property . . . ." (Id. ¶ 53.)

However, despite Plaintiffs' allegations to the contrary, Defendants did not place the Property in a condition where it could not be reopened until the Coordination Form was approved – Mr. Nance did. Plaintiffs first request for the Coordination Form was denied on April 5, 2017. (Id. ¶ 33.) Mr. Nance began removing furnishings, rendering the Property uninhabitable, after April 21, 2017. (Id. ¶ 38.) Defendants never asked Plaintiffs to improve the Property or initiate renovations before being issued a Coordination Form. The Bowen Letter never mentions a need to improve the physical condition of the Property but cites the tenants and their criminal conduct as the source of the nuisance. (Bowen Letter (Doc. 1-1).) In his response to Defendant Bowen's letter, Mr. Nance proposed that he renovate the Property and evict the tenants; he also asked for a response in five business days as to whether that plan would be acceptable. (Nance Letter (Doc. 1-2) at 1–2.) Plaintiffs allege that Defendants did not respond. (Compl. (Doc. 1) ¶ 27.)

In fact, as Plaintiffs allege repeatedly, Defendants stated that they wanted to see the Property demolished, not renovated. (Compl. (Doc. 1) ¶¶ 31, 40, 52.) Plaintiffs themselves made the

-79-

decision to begin renovations before being granted the Coordination Form or appealing the first denial. By requiring Plaintiffs to get an approved Coordination Form, Defendants did not deprive the Property of all economic value.[17] See United States v. Locke, 471 U.S. 84, 107 (1985) ("Regulation of property rights does not 'take' private property when an individual's reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed.").

Plaintiffs can also not claim a taking of any property interest in the Coordination Form itself. A building permit itself can sometimes constitute a property interest. "Where a previously valid permit has issued and construction begun, a subsequent rezoning that effectively revokes permission to build is a confiscatory taking of the permit itself." Scott, 716 F.2d at 1421. However, "the permit, until it is at least actually in hand, is not in the nature of interests the deprivation of which is encompassed by the Fifth Amendment 'takings' doctrine." Id. Plaintiffs never had the Coordination Form "in hand," (Compl.

---

[17] Plaintiffs allege they were seeking renovations to "Building 3" of the Property. (Compl. (Doc. 1) ¶ 30.) This suggests there were multiple structures on the Property that were not being renovated, further suggesting that the Property was not deprived of all viable economic use.

Case 1:19-cv-00641-WO-JLW   Document 22   Filed 02/16/21   Page 80 of 88

(Doc. 1) ¶ 87), meaning its denial cannot qualify as a taking
under the Fifth Amendment.

That Stanly County revoked their permits after Defendants
denied Plaintiffs' City Coordination Form does not mean that
Defendants took Plaintiffs' property interest in those county
permits. Those permits were contingent on approval of the City
of Albemarle Coordination Form. (Compl. (Doc. 1) ¶ 34.) Those
permits were not "in hand," nor could Defendants be held
responsible for the actions of an independent political entity.
See Tri-County Paving, 281 F.3d at 437 ("However, [the
plaintiff] never submitted a complete application — it lacked a
written application, a wastewater permit, and an air quality
permit. The County was under no obligation to issue a building
permit without the required documentation and permits.").[18]

Finally, the fact that Plaintiffs were eventually granted a
Coordination Form in February 2019 also renders their taking
claim implausible as the delay did not destroy all economically
viable use. As the Supreme Court held in the context of a
regulatory denial of a permit,

_____

[18] The letter from the City's Section 8 inspector was also
not a permit, but a letter expressing an opinion that if
renovations were completed, the Property could host Section 8
tenants. (Compl. (Doc. 1) ¶ 16.) That opinion letter was not a
"permit in hand" that created a vested property interest.

-81-

even if the [plaintiffs'] ability to sell their property was limited during the pendency of the condemnation proceeding, [they] were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decisionmaking, <u>absent extraordinary delay</u>, are "incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense."

<u>Agins v. City of Tiburon</u>, 447 U.S. 255, 263 n.9 (1980), <u>abrogated on other grounds by</u> <u>Lingle v. Chevron U.S.A. Inc.</u>, 544 U.S. 528 (2005) (emphasis added).[19]

Notably, several courts have held that much longer delays are not extraordinary. <u>See, e.g.</u>, <u>Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City</u>, 473 U.S. 172 (1985) (no temporary taking despite eight year delay); <u>Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency</u>, 535 U.S. 302, 306 (2002) (thirty-two month delay not extraordinary); <u>Wyatt v. United States</u>, 271 F.3d 1090 (Fed. Cir. 2001) (same for seven year delay); <u>Dufau v. United States</u>, 22 Cl. Ct. 156, 163 (Cl. Ct. 1990) (permit delay of sixteen months did not constitute temporary taking); <u>Appolo Fuels, Inc. v. United States</u>, 381 F.3d 1338, 1351 (Fed. Cir. 2004) (eighteen-month delay was "far short of extraordinary").

---

[19] In <u>Lingle v. Chevron U.S.A., Inc.</u>, 544 U.S. 528 (2005), the Supreme Court clarified that, contrary to suggestions in <u>Agins</u>, the lack of a nexus between a legitimate state interest and government regulation did not in and of itself effect a taking; instead, government regulation lacking such a nexus was properly subject to challenge under the Due Process Clause. Importantly, <u>Lingle</u> did not overrule other holdings of <u>Agins</u> or affect discussion of "delay" or "extraordinary delay" at all in the opinion. <u>Res. Invs., Inc. v. United States</u>, 85 Fed. Cl. 447, 494 n.70 (2009).

LXR RS V, LLC v. Mun. of Norristown, Case No. 2:19-cv-01397-JDW, 2019 WL 4930157, at *4 (E.D. Pa. Oct. 7, 2019).

Plaintiffs first sought approval of the Coordination Form on April 5, 2017. (Compl. (Doc. 1) ¶ 33.) Plaintiffs were granted an approved form in February 2019. (Id. ¶ 73.) The delay of roughly 22 months is far shorter than the periods of delay that other courts found were not extraordinary.[20]

For all these reasons, this court finds that Plaintiffs have failed to plausibly allege a Takings Clause claim under the Fifth Amendment of the U.S. Constitution.

### 6. Civil Conspiracy

Finally, this court finds that Plaintiffs have failed to plausibly allege a civil conspiracy by Defendants to deprive Plaintiffs of any constitutional rights.

---

[20] Plaintiffs also cannot plausibly allege that the pendency of the nuisance action, even if procedurally flawed, was a compensable taking.

> The Town's actions to abate a nuisance were reasonable — if mistaken — uses of its police power that did nothing to deprive the Owners of any property right, even if the cottages were rendered valueless. See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 492 n.22 (1987) ("Courts have consistently held that a State need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance.").

Sansotta, 724 F.3d at 541.

"To establish a civil conspiracy under § 1983, [the

plaintiffs] must present evidence that the [defendants] acted

jointly in concert and that some overt act was done in

furtherance of the conspiracy which resulted in [the

plaintiffs'] deprivation of a constitutional right . . . ."

Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996).

> Other courts also have emphasized the need to prove a
> deprivation of a constitutional right or privilege.
> See, e.g., Askew v. Millerd, 191 F.3d 953, 957 (8th
> Cir. 1999); Villanueva v. McInnis, 723 F.2d 414, 418
> (5th Cir. 1984) ("[I]t remains necessary to prove an
> actual deprivation of a constitutional right; a
> conspiracy to deprive is insufficient."); accord Byrd
> v. Hopson, 265 F. Supp. 2d 594, 599 (W.D.N.C. 2003)
> (Under North Carolina state law, "there is no
> independent cause of action for [common law] civil
> conspiracy; the claim can arise only where there is an
> underlying claim for unlawful conduct."), aff'd in
> part and rev'd in part on other grounds, 108 Fed.
> Appx. 749 (4th Cir. 2004).

Hicks v. Mount Airy-Surry Cnty. Airport Auth., No. 1:15-CV-38,

2015 WL 8484453, at *9-10 (M.D.N.C. Dec. 9, 2015) (dismissing

§ 1983 civil conspiracy claims after finding that underlying

§ 1983 actions should be dismissed).

This court has found that Plaintiffs have failed to

plausibly allege First Amendment, Fifth Amendment Taking, or

Fourteenth Amendment procedural due process, equal protection,

or substantive due process claims. Therefore, Plaintiffs' § 1983 civil conspiracy claim should be dismissed as well.[21]

Additionally, though the doctrine does not apply to Defendant Shoaf, the intracorporate immunity doctrine bars any conspiracy claim against Defendants City, Michael, Bowen, and Robinson. "The intracorporate conspiracy doctrine recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own." Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 352 (4th Cir. 2013). "The doctrine is applicable to municipalities. Moreover, merely suing the officers, employees, or agents in their individual capacities does not change the result." Fox v. City of Greensboro, 807 F. Supp. 2d 476, 499 (M.D.N.C. 2011); see also Buschi v. Kirven, 775 F.2d 1240, 1252 (4th Cir. 1985). Plaintiffs do not contend that Defendants Michael, Bowen, and Robinson were all employees of the Defendant City; instead they argue that they acted

---

[21] The Fourth Circuit has noted it is possible that a claim of civil conspiracy can survive after an officer was found not liable on a related but distinct constitutional claim. See Hinkle, 81 F.3d at 421 (noting that the claim of a civil conspiracy to deny appellants access to the courts "is not mooted by the mere fact Officer Lake was found not liable for using excessive force against Wilson"). Though Defendants' nuisance suit was dismissed on subject matter jurisdiction grounds, Plaintiffs do not base their federal claims on the nuisance suit but instead on the same facts alleged in their underlying § 1983 claims. (Compl. (Doc. 1) ¶¶ 105-09.)

-85-

according to personal motives and exceeded their authority. (Pls.' First Resp. (Doc. 13) at 19.) While it is true that intracorporate immunity does not apply "where a co-conspirator possesses a personal stake independent of his relationship to the corporation," or "the agent's acts were not authorized by the corporation," Painter's Mill Grille, 716 F.3d at 353, this court does not find that Plaintiffs' allegations, particularly since they fail to state any underlying claims, support those exceptions.

### D. Plaintiffs' State Claims

With the only claims over which this court had original jurisdiction now dismissed, this court will dismiss Plaintiffs' state law claims (Claims Two, Eight, Nine, Ten, and Twelve). A district court may dismiss a state law claim brought before it under supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The decision to do so is completely within the court's discretion. Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009); Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) ("[W]hen a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction, pursuant to [28 U.S.C.] § 1367, over pendent state-law claims."). Further,

-86-

the Fourth Circuit has held that "governmental actions that are violative of state law are properly challenged in state courts which exist, in part, to protect citizens from abuses of state law." Tri-County Paving, 281 F.3d at 441 (internal quotations omitted).

Since this matter has not progressed past the motion to dismiss stage and only state law claims remain, this court declines to exercise its supplemental jurisdiction over Claims Two, Eight, Nine, Ten, and Twelve. With all claims dismissed, Claim Eleven for Punitive Damages will also be dismissed.

IV. **CONCLUSION**

For the foregoing reasons, this court finds that Defendants City, Michael, Bowen, and Robinson's Motion to Dismiss, (Doc. 10), as well as Defendant Shoaf's Motion to Dismiss, (Doc. 14), should both be granted in part as to all federal claims.

**IT IS THEREFORE ORDERED** that the Motion to Dismiss pursuant to Rule 12(b)(6) filed by Defendants City of Albemarle, Mayor Ronnie Michael, Chief Danny Bowen, and Kevin Robinson, (Doc. 10), is **GRANTED IN PART.** Claims One, Three, Four, Six, and Seven are **DISMISSED** pursuant to Fed. R. Civ. P. 12(b)(6). Claim Eleven is **DISMISSED AS MOOT.** Claims Two, Eight, Nine, Ten, and Twelve are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3).

-87-

**IT IS FURTHER ORDERED** that Defendant Shoaf's Motion to Dismiss, (Doc. 14), is **GRANTED IN PART.** Claims Five and Seven are dismissed pursuant to Fed. R. Civ. P. 12(b)(6). Claim Eleven is **DISMISSED AS MOOT.** Claims Eight, Nine, Ten, and Twelve are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3).

A judgment reflecting this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 16th day of February, 2021.

_____
United States District Judge